*In re* ESTATE OF ALBERT BRUCE ANDERSON, Deceased (Central Illinois Trucks, Inc., *et al.*, Claimants-Appellants, v. Betty Lee Anderson, Ex'r, Defendant-Appellee).

Fourth District   No. 4—91—0747

Argued June 24, 1992.—Opinion filed June 10, 1993.

Marvin H. Gesell (argued), of Bloomington, for appellants.

Maurice J. Barry (argued), of Ostling, Ensign, Barry & Glenn, of Bloomington, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Claimants Central Illinois Trucks, Inc. (Central), and Paccar Financial Corporation (Paccar), appeal from denial of their claims filed in the estate of Albert Bruce Anderson (decedent) as untimely pursuant to a motion for directed findings filed by the estate at the close of claimants' case. The trial court found (1) claimants Central and Paccar were not reasonably ascertainable creditors of the estate and (2) their claims were conjectural; and further found (3) Richard Hagstrom, Central's general manager, attended decedent's wake and had actual notice of the date of death. We vacate and remand.

## I. BACKGROUND

On January 27, 1986, decedent executed security agreement/retail installment contracts for the purchase of four trucks from Central for use in his trucking business, Albert B. Anderson, d/b/a Anderson Trucking. The contracts were assigned on partial recourse to Paccar. Less than four months later, decedent executed assignments of his interest in the four trucks to Harry Schubbe, who agreed to make payments on the unpaid balance on each of the trucks. The one-page transfer agreements expressly provided that decedent remained liable under the original contracts; the assignments were consented to, subject to the security agreements, by Richard Hagstrom, treasurer, on

behalf of Central, and J.F. Giordano, finance representative, on behalf of Paccar.

Decedent died on April 28, 1988, leaving a wife, Betty, and four surviving children (Michael, Daniel and Misty Anderson (a minor), and Marcia Wickenhauser). Richard Hagstrom knew of the death of decedent on the day he died and attended the wake or funeral.

Decedent's will was filed with the circuit court on May 10, 1988, and a petition for probate of the will and issuance of letters testamentary was filed on May 20, 1988. The approximate value of the estate was listed as $54,100 in personal property, and $30,000 in real estate with annual income from the real estate listed as unknown.

By the will, decedent left his entire estate to his wife and appointed her executor. On May 27, 1988, the will was admitted to probate, Betty was named independent executor (see Ill. Rev. Stat. 1987, ch. 110½, pars. 28—1 through 28—12), and letters of office were issued to her. Publication notice of the death and issuance of letters was in accord with section 18—3(a) of the Probate Act of 1975 (Act) (Ill. Rev. Stat. 1987, ch. 110½, par. 18—3(a)), with the third publication date being June 24, 1988. Neither Central nor Paccar filed claims within the six-month limitations period provided by section 18—3(a) of the Act.

Schubbe, meanwhile, had filed for bankruptcy and listed the four semi-tractors as assets. Upon a lifting of the stay order in the bankruptcy case, Paccar obtained possession of the four trucks in April 1989. On May 4, 1989, Central and Paccar filed claims in the estate for the balance due under the four contracts. The trucks were sold at a public sale in May 1989. Central and Paccar pursued their claims against decedent's estate for the deficiency between the proceeds of sale and the balance due under the four contracts. The estate disputed the claims as untimely.

By way of background, though not pertinent to our resolution of the issues, a review of the entire record also suggests the following. After the assignment of the four trucks in question to Schubbe, decedent purchased five additional trucks and four vans from Central, the purchases financed through Associates Commercial Corporation. After decedent's death, the family continued operating the trucking business as an ongoing concern under the same licenses and ICC certificate and serving the existing contract customers. Son Daniel and daughter Marcia ran the business for their mother, both drawing salaries; son Michael worked for Central. After decedent's death, Daniel purchased another truck through Central in November 1988 for use in the Anderson Trucking business, financed through Associates, signing

his own name. According to affidavits, Anderson Trucking continued to pay on certain of the notes on which Central had limited liability. By the time depositions were taken on November 14, 1989, son Dan had incorporated as D. Anderson Trucking, Inc., but no licenses had been transferred; instead, the family continued to run the decedent's business as an ongoing concern. By October 24, 1990, the ICC permit and certificate issued to Albert Anderson and Albert B. Anderson, d/b/a Anderson Trucking, had apparently been transferred to D. Anderson Trucking, although there was no written contract between the executrix of the estate and Dan Anderson or D. Anderson Trucking as to the transfer, and there was no consideration therefor.

## II. Probate Notice Requirements

At the time of decedent's death, section 18—3(a) of the Act provided as follows:

"Publication. (a) It is the duty of the representative to publish once each week for 3 successive weeks, commencing within 14 days after the issuance of letters of office, a notice informing all persons of [(1)] the death of the decedent, [(2)] the date of issuance of the letters, [(3)] the name and address of the representative and of his attorney of record and [(4)] that *claims may be filed within 6 months from the date of issuance of the letters and that any claim not filed within that period is barred.*" (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 110½, par. 18—3(a).)

On April 19, 1988, the United States Supreme Court decided *Tulsa Professional Collection Services, Inc. v. Pope* (1988), 485 U.S. 478, 99 L. Ed. 2d 565, 108 S. Ct. 1340, holding that notice by publication to creditors of the estate who are known or reasonably ascertainable is inconsistent with the requirements of due process and such creditors must be given " '[n]otice by mail or other means as certain to ensure actual notice.' " (*Pope,* 485 U.S. at 491, 99 L. Ed. 2d at 579, 108 S. Ct. at 1348, quoting *Mennonite Board of Missions v. Adams* (1983), 462 U.S. 791, 800, 77 L. Ed. 2d 180, 188, 103 S. Ct. 2706, 2712.) In that case, the Court remanded to determine whether "reasonably diligent efforts" had been made to ascertain the identity of the claimant. *Pope,* 485 U.S. at 491, 99 L. Ed. 2d at 579, 108 S. Ct. at 1348.

After *Pope,* the Illinois legislature amended various provisions of the Act (see Pub. Act 86—815, eff. Sept. 7, 1989 (1989 Ill. Laws 4269, 4269 through 4273)), including sections 18—3, 18—12, and 28—11 (see Ill. Rev. Stat. 1987, ch. 110½, pars. 18—3, 18—12, 28—11). Section 18—3 of the Act was amended to read:

"Notice—Publication. (a) It is the duty of the representative to publish once each week for 3 successive weeks, *and to mail or deliver to each creditor of the decedent whose name and post office address are known to or are reasonably ascertainable by the representative* and whose claim has not been allowed or disallowed as provided in Section 18—11, *a notice stating* [(1)] the death of the decedent, [(2)] the name and address of the representative and of his attorney of record, [(3)] that claims may be filed on or before the date stated in the notice, which date shall be not less than 6 months from the date of the first publication or 3 months from the date of mailing or delivery, whichever is later, and [(4)] that any claim not filed on or before that date is barred.

(b) The published notice under subsection (a) of this Section must be published in a newspaper published in the county where the estate is being administered and may be combined with any notice under Section 6—10 or subsection (b) of Section 9—5. The representative must file proof of publication with the clerk of the court." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 110½, par. 18—3.)

Section 18—12 of the Act was amended to read:

"Limitations on payment of claims. (a) *Every claim against the estate* of a decedent, except expenses of administration and surviving spouse's or child's award, *is barred* as to all of the decedent's estate *if*

(1) *Notice is given to the claimant as provided in Section 18—3* and the claimant does not file a claim with the representative or the court on or before the date stated in the notice; or

(2) Notice of disallowance is given to the claimant as provided in Section 18—11 and the claimant does not file a claim with the court on or before the date stated in the notice; or

(3) *The claimant or the claimant's address is not known to or reasonably ascertainable* by the representative and the claimant does not file a claim with the representative or the court on or before the date stated in the published notice as provided in Section 18—3.

(b) *Unless sooner barred under* subsection (a) of this Section, *all claims which could have been barred under this Section are,* in any event, *barred 2 years after decedent's death,*

whether or not letters of office are issued upon the estate of the decedent.

\*\*\*

(d) Except with respect to a claimant whose claim is known to the representative and is not paid or otherwise barred under this Section, a representative who acts in good faith to determine and give notice to creditors of a decedent, as provided in Section 18—3, is not personally liable to a creditor of a decedent, but any claim not barred under this Section may be asserted against (1) the estate, to the extent that assets have not been distributed, and (2) a distributee of the estate (other than a creditor), but only to the extent that the distributee's share of the estate will not, in effect, be diminished below what the distributee would have received had the claim been paid by the representative." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 110½, pars. 18—12(a), (b), (d).)

Section 28—11 of the Act was amended to read in pertinent part as follows:

"Closing the estate. (a) *An independent representative is accountable to all interested persons for his administration and distribution of the estate* but need not present an account to the court unless an interested person requests court accounting as in supervised administration.

(b) An independent representative seeking discharge shall mail or deliver to all interested persons an accounting and shall file in the court a verified report stating substantially as follows:

(1) In a testate estate, that notice has been given to the extent required by Section 6—10.

(2) In an intestate estate, that notice has been given to the extent required by Section 9—5.

(3) That the notice required by Section 18—3 has been published, *that reasonable care was used to determine the creditors of the decedent and that all known creditors have been given notice as required under Section 18—3.*" (Emphasis added.)

Ill. Rev. Stat. 1989, ch. 110½, pars. 28—11(a), (b)(1) through (b)(3).

In this case, the circuit court was presented with circumstances requiring application of the then-existing statutory scheme in light of the Supreme Court's analysis in *Pope.* There, the Court stated:

"Where the legal proceedings themselves trigger the time bar, even if those proceedings do not necessarily resolve the claim on its merits, the time bar lacks the self-executing feature that [*Texaco, Inc. v. Short* (1982), 454 U.S. 516, 70 L. Ed. 2d 738, 102 S. Ct. 781,] indicated was necessary to remove any due process problem. Rather, in such circumstances, due process is directly implicated and actual notice generally is required." (*Pope*, 485 U.S. at 487, 99 L. Ed. 2d at 577, 108 S. Ct. at 1346.)

The *Pope* Court reasoned:

"In assessing the propriety of actual notice in this context consideration should be given to the practicalities of the situation and the effect that requiring actual notice may have on important state interests. *** Creditors, who have a strong interest in maintaining the integrity of their relationship with their debtors, are particularly unlikely to benefit from publication notice. As a class, creditors may not be aware of a debtor's death or of the institution of probate proceedings. Moreover, the executor or executrix will often be, as is the case here, a party with a beneficial interest in the estate. This could diminish an executor's or executrix's inclination to call attention to the potential expiration of a creditor's claim. There is thus a substantial practical need for actual notice in this setting.

At the same time, the State undeniably has a legitimate interest in the expeditious resolution of probate proceedings. *** Providing actual notice to known or reasonably ascertainable creditors, however, is not inconsistent with the goals reflected in nonclaim statutes. Actual notice need not be inefficient or burdensome. We have repeatedly recognized that mail service is an inexpensive and efficient mechanism that is reasonably calculated to provide actual notice. [Citations.] In addition, *Mullane [v. Central Hanover Bank & Trust Co.* (1950), 339 U.S. 306, 94 L. Ed. 865, 70 S. Ct. 652,] disavowed any intent to require 'impracticable and extended searches *** in the name of due process.' 339 U.S.[ ] at 317-318[, 94 L. Ed. at 875, 70 S. Ct. at 659]. As the Court indicated in *Mennonite [Board of Missions v. Adams* (1983), 462 U.S. 791, 77 L. Ed. 2d 180, 103 S. Ct. 2706], all that the executor or executrix need do is make 'reasonably diligent efforts,' 462 [U.S. at 798 n.4, 77 L. Ed. 2d at 187 n.4, 103 S. Ct. at 2711 n.4], to uncover the identities of creditors. For creditors who are not 'reasonably ascertainable,' publication notice can suffice. Nor is everyone who may con-

ceivably have a claim properly considered a creditor entitled to actual notice. Here, as in *Mullane,* it is reasonable to dispense with actual notice to those with mere 'conjectural' claims. 339 U.S.[ ] at 317[, 94 L. Ed. at 875, 70 S. Ct. at 659].

On balance then, a requirement of actual notice to known or reasonably ascertainable creditors is not so cumbersome as to unduly hinder the dispatch with which probate proceedings are conducted. Notice by mail is already routinely provided at several points in the probate process. ***

In analogous situations we have rejected similar arguments that a pressing need to proceed expeditiously justifies less than actual notice. For example, while we have recognized that in the bankruptcy context there is a need for prompt administration of claims, [citation], we also have required actual notice in bankruptcy proceedings. [Citations.] Probate proceedings are not so different in kind that a different result is required here." (*Pope,* 485 U.S. at 489-91, 99 L. Ed. 2d at 578-79, 108 S. Ct. at 1347-48.)

In *Pope,* the decedent had been in a hospital from November 1978 until his death on April 2, 1979. His will was admitted to probate and his widow named executrix; publication notice was all that was required or given and neither the hospital nor its parent company filed a claim for expenses of the last illness within the statutory two-month period of first publication. The Supreme Court remanded for proceedings to determine whether "reasonably diligent efforts" would have identified the hospital and uncovered its claim.

### III. Evidence Presented To Establish Claims

At final hearing on the claims in August 1991, claimants Central and Paccar presented testimony and exhibits through several witnesses.

#### A. *Paccar's Collector*

Patricia Barlow, collector for Paccar, produced Paccar's records on the account of Albert B. Anderson, d/b/a Anderson Trucking, regarding four truck tractors he purchased. She identified, as claimants' exhibit Nos. 1 through 4, four security agreement/retail installment contracts, and explained Anderson went to Central to buy the trucks and Paccar provided the financing. Paccar purchased the contracts from Central with recourse back against Central for 10% of the payoff; *i.e.,* in the event of default, the dealership is "on the hook" for 10% of the balance as of the time of public sale. Attached to each con-

tract was a transfer of interest document transferring title for the equipment from Anderson to Harry Schubbe, with Schubbe having responsibility for the payments but Anderson not relieved of the obligation. She testified all four contracts were in default.

Barlow produced account summary reports for the date of public sale and testified that contract balances on the four trucks were $53,454.69; $51,394.22; $51,156.90 and $55,7847.78. Barlow testified Paccar had been unable to repossess the four trucks for a time because of an automatic stay order imposed when Schubbe filed bankruptcy. When the bankruptcy stay lifted, Paccar repossessed the trucks when they were returned to Central at the end of April 1989.

Barlow testified after she obtained possession of the trucks she had an appraisal of their condition from Central (by Michael Anderson) and she set up a public sale for May 26, 1989, advertising in the newspaper and giving notice to all the Andersons on paperwork that went out on May 4, 1989. She testified Paccar's policy is to sell the truck for the appraised value or the payoff, the lower of the two. The sale of the four trucks resulted in the following deficiencies:

| Claimants' exhibit No. | Truck Serial No. | Paccar Account No. | payoff balance | sale price/ appraisal value | deficiency |
|---|---|---|---|---|---|
| 1 | 334040 | 5280 | $53,381.69 | $35,274.61 | $18,107.08 |
| 2 | 334044 | 5283 | 55,072.89 | 35,561.73 | 19,511.16 |
| 3 | 334043 | 5282 | 50,399.68 | 26,020.00 | 15,379.68 |
| 4 | 33041 | 5281 | 51,324.17 | 31,308.25 | 20,015.92 |

Barlow testified demand for the balance due on each of the trucks was made via the notice of public sale. The public sale resulted in deficiencies, and Barlow notified Central of its dealer's liability, $21,208.40, by letter of July 1, 1989, which Central then paid Paccar. Barlow testified the balance due on the contracts was $74,919.51 plus interest and 15% for attorney fees, less the $21,208.40 paid by Paccar—a total of $53,711.11 plus interest and 15% ($8,056.67) for attorney fees.

Barlow testified, based on her familiarity with Paccar's books and records on the Anderson accounts, Paccar had never received any notice to file a claim in the estate within a certain time period. Paccar had paid Central the principal figure when it purchased each of the four contracts.

In cross-examination, Barlow testified payments had been made on the trucks up to November 1988. Paccar bought the trucks at sale

for the appraised value, with no one else bidding. Neither Paccar nor any agent knew of decedent's death until Central's personnel contacted it a few days before its claim was filed. After Paccar's notice of public sale was sent out, Barlow received a call from Central saying she would have to change the date of public sale because she had to send notices to the estate of Albert Bruce Anderson, Dan Anderson, and Betty Anderson. Asked whether anyone at Paccar had an obligation to check legal notices, Barlow answered "no."

She acknowledged sending a letter, estate's exhibit No. 1, dated April 11, 1989, to Anderson Trucking. This letter advised of the trucks' serial numbers, purchase date, transfer to Schubbe, his default, and the financial liability of Albert Anderson, d/b/a Anderson Trucking, under the transfer agreements. The letter requested past due payments of $35,979.72.

### B. *Central's General Manager*

Richard Hagstrom, at the time of hearing Central's general manager and secretary-treasurer, testified he had been acquainted with the deceased since 1976 when he started with Central. He had signed the security agreements/retail installment contracts on January 27, 1986, and the transfer agreements later. He personally saw decedent sign all the same documents. He testified decedent had personal liability on the original contracts pursuant to the terms of the transfer agreements executed May 12, 1986.

Hagstrom testified, based on his familiarity with the books and records of Central in regard to Albert Bruce Anderson's accounts, particularly these four trucks, no one on behalf of the executor of the estate had notified Central to file a claim in the estate. He testified the four contracts were on limited liability recourse to Paccar and Paccar had written (claimants' exhibit No. 6) explaining Central's liability on the four contracts.

Hagstrom testified he was present about a year earlier at the deposition of Betty Anderson and she had then understood there was a balance owing on an account with Paccar at the time of decedent's death.

In cross-examination, Hagstrom acknowledged he knew of decedent's death the day he died and attended the funeral or wake. He did not see a legal claim notice published concerning this estate; no one at Central had a duty to read legal notices. He was aware of Schubbe's financial problems. He first spoke to Dan Anderson in the February to April 1989 time frame when the trucks were repossessed.

### C. *Central's Comptroller*

Erick Miner, Central's comptroller, testified he prepares Central's financial statements and keeps track of its books and records. He was familiar with Central's books and records on the account with Albert Bruce Anderson claims and the four trucks financed by Paccar. He testified Paccar made a demand on Central on June 30, 1989, under the recourse agreement and Central paid Paccar $21,208.40 plus simple interest from the date of demand ($5,987.02) and 15% as attorney fees ($4,079.31) for a total of $31,274.73 owed Central.

### D. *Betty Anderson, Executrix*

Betty Anderson, called as an adverse witness, testified decedent did business as an individual proprietorship of Albert Bruce Anderson, d/b/a Anderson Trucking. After decedent's death, she and her son Dan continued the trucking business. The following colloquy ensued:

"Q. [By claimants' counsel:] After you became the Executor of your husband's Estate, did you personally make any inquiry as in regard to Paccar Financial obligations that your husband had been obligated on in regard to these trucks and Harry and Beverly Schubbe?

A. [By Betty Anderson:] No.

\* \* \*

[Claimants' counsel]: \* \* \*

And did you, as Executor, or anyone as your agent on your behalf, give Paccar Financial Corporation, or Central Illinois Trucks, Incorporated[,] any notice of any claim dates in your husband's Estate?

A. No.

Q. Were you personally aware, during your husband's lifetime, that he had purchased these four trucks in question from Central Illinois Trucks and they had been financed with Paccar Financial Corporation?

A. Yes, I did know that.

Q. And were you also, during your husband's lifetime, personally aware that \* \* \* he transferred those trucks to a Harry Schubbe under a Transfer Agreement?

A. No, I did not. I thought that he was completely off of the paper. He just signed the trucks over to him, but he was to have taken them completely over.

Q. But *** after you became the Executor what, if any, type of investigation did you do as Executor in regard to the Harry Schubbe Contract and Paccar?

A. I didn't know there was any obligation to them.

Q. As Executor *** of the Estate of Albert Bruce Anderson, after your appointment as his Executor did you send any notice to Paccar Financial Corporation to file a claim in his Estate?

A. No.

Q. And after your appointment as Executor in this case did you send any notice to Central Illinois Trucks to file a claim in this Estate?

A. No.

Q. And after your appointment as Executor in this case did you notify Paccar Financial Corporation that they must file a claim in the Estate by a certain date?

* * *

A. No.

Q. And did you notify Central Illinois Trucks, Incorporated[,] that they had to file a claim in your husband's Estate by a certain date?

A. No."

### E. *Estate's Motion for Directed Finding*

Having presented the above evidence, claimants rested their case and the estate moved for a directed finding as to the claims of Central and Paccar, arguing (1) they were not reasonably ascertainable as creditors under *Pope* and *Pope* did not apply, and (2) these claims were contingent until the sale and deficiency in May 1989, while the claims period expired in December 1988, so claimants must pursue another avenue of redress under *In re Estate of Rice* (1981), 96 Ill. App. 3d 1137, 421 N.E.2d 1034, *Puhrman v. Ver Vynck* (1981), 99 Ill. App. 3d 1130, 426 N.E.2d 921, and *Union Trust Co. v. Shoemaker* (1913), 258 Ill. 564, 101 N.E. 1050.

### F. *The Court's Ruling*

The court denied the claims of Central and Paccar "for failure to be filed within the statutory time period of six months, public notice." The court reasoned as follows:

"In this case the Court finds that there is really no question. I don't think that Mrs. Anderson did not [*sic*] actually know that there was a debt owed to Paccar Financial, or Central Illi-

nois Trucks. There is no sufficient proof to indicate that she is so closely connected with the business that she would understand that Anderson Trucking owed those people for these trucks. The question is then how reasonably ascertainable was this debt?

Well, going through the business papers one might find the Contracts, the original Security Agreement, and if one had some sophistication in those matters, can read those and see that although Mr. Schubbe bought the trucks, Anderson Trucking still remained liable on the underlying obligation, if anything, because Mr. Schubbe had defaulted. But in the Court's mind that would have taken a pretty sophisticated inquiry.

\*\*\* [I]n addition to that you would have to know not only that that obligation existed, but you would also have to know what Mr. Schubbe's situation was and whether he was still paying or not.

\*\*\* [T]he timing of [the] thing here is somewhat unfortunate for the claimants in this case that things were still going on. And the *Pope* case gives little guidance as to what is a reasonably ascertainable factor. In *Pope* they sent the case back for the Trial Court to determine whether the claimants were reasonably ascertainable and didn't say a word what standards would be used to determine that factor. And because of that I am in the dark as to what standard I am suppose[d] to be using to determine whether this information was reasonably ascertainable or not.

While I have concluded [(1)] that the claimants have failed to prove that the claim was reasonably ascertainable among [*sic*] Mrs. Anderson, [(2)] the contingent nature of it, depending on what Mr. Schubbe's status was, the factual matter of the bankruptcy and so on, you would have had to have known that, [(3)] plus understand the legal nature of the Contracts. And I think with that that makes it not reasonably ascertainable.

\* \* \*

\*\*\* [T]he Court finds on the basis of what it has just indicated, I might also indicate one other ground which is not essential to the Court's grounds, which the evidence today shows could be relevant in case this is appealed, and that is [(4)] the testimony of Mr. Hagstrom that he was aware of Mr. Anderson's death and that he attended the wake. As far as the Court is concerned, by virtue of his status in Central Illinois Trucks, he had actual notice of the death of Bruce Anderson. \*\*\*

\*\*\* [T]he Court finds that the claims of Paccar Financial and Central Illinois Trucks are barred by [not having been submitted] within the statutory time period. That under *Pope* this was not an easily [*sic*], was not a known, or easily [*sic*] known easily [*sic*] ascertainable claim \*\*\*."

This appeal followed.

## IV. ANALYSIS

This case was resolved on the estate's motion for a directed finding as to the claims of Central and Paccar. Such a ruling is governed by section 2—1110 of the Code of Civil Procedure. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1110.) We consider the issues presented in light of this standard.

### A. *Sufficiency of Evidence to Demonstrate Claims were Reasonably Ascertainable under Pope*

The critical question in this case is whether the claimants, as secured creditors, were reasonably ascertainable upon reasonably diligent efforts by the executrix to ascertain decedent's debts and creditors. This determination is a question of fact for the trier of fact. If claimants were reasonably ascertainable, they were entitled to actual notice and if they did not get it, the time bar of section 18—3 of the Act *did not commence to run against them.*

As the trial court here noted, the *Pope* Court did not allocate the burden of proof on the "reasonably ascertainable by reasonably diligent efforts" issue. How is this language to be given effect? The Act, as amended, incorporates "reasonably ascertainable" language, but even if it did not this question has significance beyond this case to those involved in estate administration and, of course, to creditors.

■ Upon reviewing *Pope*, we conclude that claimants who file a claim more than six months from the issuance of letters bear the initial burden of producing evidence sufficient to establish their failure to receive written notice by mail or delivery under section 18—3 of the Act. Upon such a showing, the burden then shifts to the estate representative to show either that the statutory notice was given, which will automatically bar the claim, or, in the absence of notice, that the existence of the claim was not reasonably ascertainable upon reasonably diligent efforts. If the estate representative is able to prove this latter proposition by a preponderance of the evidence, then the claim will be barred.

■ In determining whether the estate representative has met her burden on this latter proposition, the focus should not be on the ac-

tual knowledge of the claim by the executrix nor upon what she subjectively understood legal documents to mean had she looked for them and discovered them. Rather, the focus is on the efforts expended by the executrix in attempting to discover claims against the estate.

Minimum standards of diligent inquiry would necessitate a good-faith search of decedent's personal and business financial records to disclose debts of the estate, a search comparable to that required to marshal assets and compile a complete inventory of the estate. Since decedent ran his own business, reasonably diligent efforts might include inquiry of those persons and concerns with whom Anderson Trucking had continuing business (*e.g.*, Central) as to what debts, if any, decedent had outstanding. We note *these are secured creditors*, and this in itself suggests the nature of inquiries that should have been made. (See Ill. Rev. Stat. 1987, ch. 26, par. 9—401.) To hold otherwise provides a disincentive to executors, who often are estate beneficiaries, to use reasonable diligence to ascertain and notify creditors of the estate. We emphasize this case was complicated by the fact the family continued to operate decedent's business as an ongoing concern. The law imposes duties on the executor of the estate which must be fulfilled on pain of liability.

Accordingly—unless we find the claims are barred as conjectural or because Hagstrom had actual notice of decedent's death—we must vacate the circuit court's ruling holding the claims of Central and Paccar time barred, and remand for further proceedings, *i.e.*, to allow the estate to put forth evidence that reasonably diligent efforts, if any, were made, when and by whom, to ascertain the existence of debts against decedent and the identities of creditors with debts outstanding upon the date of death.

## B. *Were the Claims "Conjectural"?*

The trial court also found the claims of Central and Paccar to be "conjectural" (so claimants were not entitled to actual notice). (See *Pope*, 485 U.S. at 489-90, 99 L. Ed. 2d at 578-79, 108 S. Ct. at 1347.) The estate cites *Chicago Title & Trust Co. v. Corp. of the Fine Arts Building* (1919), 288 Ill. 142, 155-56, 123 N.E. 300, 305, as prohibiting creditors holding only "contingent" claims from filing against the estate.

■ The transfer of interest agreements by which decedent transferred ownership of the four trucks he purchased from Central under security agreements/retail installment contracts to Harry Schubbe specifically provided decedent remained liable under the contracts. The claims of Central and Paccar, its assignee, as represented by the

security agreements, were an absolute liability of the deceased. The assignment to Schubbe did not make the contractual liability contingent or conjectural although the estate's liability therefor was not fixed during the six-month claims period and was dependent on Schubbe's default. (See *Dunnigan v. Stevens* (1887), 122 Ill. 396, 403-04, 13 N.E. 651, 653-54; *In re Estate of Mackey* (1985), 139 Ill. App. 3d 126, 129, 487 N.E.2d 81, 83.) Therefore, the trial court erred in finding the claims of Central and Paccar "conjectural."

### C. *Effect to be Given Hagstrom's Knowledge of Decedent's Death*

Central and Paccar also argue they cannot be deemed to have had actual notice of the pendency of the estate just because an officer of Central had knowledge of the date of decedent's death and attended his funeral or wake. If the trial court was correct on the effect to be given Hagstrom's knowledge of the date of death, its ruling must be affirmed.

■ There are two forms of nonclaim statutes, a point reviewed in *Pope* as follows:

> "Nonclaim statutes come in two basic forms. *Some provide a relatively short time period*, generally two to six months, *that begins to run after the commencement of probate proceedings. Others call for a longer period*, generally one to five years, *that runs from the decedent's death.* [Citation.] Most States include both types of nonclaim statutes in their probate codes, typically providing that if probate proceedings are not commenced and the shorter period therefore never is triggered, then claims nonetheless may be barred by the longer period. [Citations.] Most States also provide that creditors are to be notified of the requirement to file claims imposed by the nonclaim statutes solely by publication. [Citations.] Indeed, in most jurisdictions it is the publication of notice that triggers the nonclaim statute." (Emphasis added.) (*Pope*, 485 U.S. at 480, 99 L. Ed. 2d at 572, 108 S. Ct. at 1342.)

In Illinois, the Act has both basic forms of nonclaims provisions, section 18—3 providing the shorter time period and section 18—12 otherwise providing the outside time limit for claims. (Ill. Rev. Stat. 1987, ch. 110½, pars. 18—3, 18—12.) The time bar of section 18—3 of the Act commenced to run not upon notice of death but on notice of death *plus* the opening of the estate, the date of issuance of letters, name and address of the representative and his attorney of record, and that claims must be filed within six months of the issuance of letters or

they would be forever barred. It is notice of the opening of the estate, the date of issuance of the letters, and the six-month period for filing claims which are critical under section 18—3(a) of the Act (Ill. Rev. Stat. 1987, ch. 110½, par. 18—3(a)). Knowledge of the date of death *cannot be equated* with knowledge of the critical elements under section 18—3(a) of the Act. Hagstrom's knowledge of decedent's death did not, therefore, commence the running of section 18—3(a) against claimants Central and Paccar. These claims were filed within 13 months of decedent's death and promptly upon discovery of the estate proceedings. The only question remaining is whether the estate can demonstrate reasonably diligent efforts were timely made and these claimants, secured creditors, were not reasonably ascertainable.

IV. CONCLUSION

The judgment of the circuit court of McLean County finding the claims of Central and Paccar barred is vacated, and the cause is remanded for further proceedings, *i.e.*, the estate may now present evidence of its "reasonably diligent efforts."

Vacated and remanded.

STEIGMANN, P.J., and LUND, J., concur.