2026 IL App (1st) 242061-U

THIRD DIVISION
May 20, 2026

No. 1-24-2061

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* ESTATE OF BEVERLY J. SOPIARZ, Deceased | ) | Appeal from the |
| | ) | Circuit Court of |
| (Joseph L. Sopiarz and Kimberlee K. Chavez, as | ) | Cook County |
| Independent Co-Executors of the Estate of Beverly J. | ) | |
| Sopiarz, | ) | |
| Movants-Appellees, | ) | No. 22 P 3622 |
| | ) | |
| v. | ) | |
| | ) | Honorable |
| Tracee Lynn Omilinsky, | ) | Kent A. Delgado, |
| Claimant-Appellant). | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Affirming the judgment of the circuit court of Cook County dismissing a statutory custodial claim filed by the decedent's daughter against the estate.

¶ 2     Following the death of Beverly Jean Sopiarz (Beverly), her daughter Tracee Lynn Omilinsky (Tracee) filed a statutory custodial claim under the Probate Act of 1975 (Probate Act) (755 ILCS 5/18-1.1 (West 2022)), seeking more than $180,000 in compensation from Beverly's estate. Among other things, Tracee claimed that she resided with and personally cared for her fully disabled mother for more than three years prior to her death. The independent co-executors

of Beverly's estate—Tracee's siblings Joseph L. Sopiarz Jr. (Joseph) and Kimberlee K. Chavez (Kimberlee)—filed a motion to dismiss Tracee's custodial claim as untimely pursuant to section 2-619(a)(5) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(5) (West 2022)), based on her failure to file the claim within the six-month period set forth in the published notice. Tracee maintained that she was a "known creditor" of the estate and was thus entitled to actual notice of the claims deadline. Given that she did not receive actual notice, Tracee argued that her custodial claim was timely, as it was filed within two years of her mother's death.

¶ 3 An evidentiary hearing was held on the sole issue of whether Tracee was a known creditor of Beverly's estate. The circuit court of Cook County found that Tracee was not a known creditor and thus dismissed her custodial claim with prejudice as untimely. On appeal, Tracee challenges the dismissal of her claim. For the reasons discussed below, we affirm.

¶ 4 BACKGROUND

¶ 5 *Estate Planning Documents and Opening of the Estate*

¶ 6 On April 18, 2001, Beverly executed a last will and testament and a declaration of trust for the Beverly Jean Sopiarz Living Trust. Beverly was the trustee and sole lifetime beneficiary of the trust; the secondary beneficiaries were her five living children: Tracee, Joseph, Kimberlee, Beckee Jo Noesges (Beckee), and Jodee Lee Holderman (Jodee).[1] The trust property included real estate in Door County, Wisconsin, and a single-family residence in the 9100 block of Sproat Avenue in Oak Lawn, Illinois (the house). Under the 2001 estate planning documents, Beverly's property generally was to be divided equally among her children.

¶ 7 On October 23, 2003, Beverly executed a codicil to the will and an amendment to the trust, which named Joseph and Kimberlee as the co-executors of the estate and co-successor

---

[1] Beverly was predeceased by her husband and by a son who passed away during childhood.

trustees of the trust. The codicil and amendment also removed Tracee as a beneficiary and replaced her with her two children, Joseph Omilinsky and David Omilinsky, who would each receive one-tenth of their grandmother Beverly's estate (*i.e.*, half of Tracee's one-fifth share). The record suggests that this change was effectuated due to Tracee's bankruptcy filing.

¶ 8    At the time of her death at age 83 on November 14, 2021, Beverly resided in the house. A petition for probate of Beverly's will was filed in the circuit court of Cook County on May 10, 2022, and letters of office subsequently were issued to Joseph and Kimberlee, as the independent co-executors of her estate (the executors). A notice published in the Chicago Daily Law Bulletin for three successive weeks—on July 5, 2022, July 12, 2022, and July 19, 2022—set forth a deadline of January 5, 2023, for the filing of claims against the estate.

¶ 9                    *Initial Disputes Involving Tracee*

¶ 10    In late March 2022, Tracee informed her siblings that their mother had executed a transfer on death instrument (transfer instrument) relating to the house which named Tracee as the sole beneficiary. After the executors filed original and amended petitions to invalidate the transfer instrument, Tracee represented that Beverly had executed a second transfer instrument for the house. The executors replied, in part, that neither transfer instrument was properly recorded. In January 2023, the initial transfer instrument was found to be void; the circuit court ordered that the parties would continue to litigate the validity of the second transfer instrument.

¶ 11    In February 2023, the executors filed a petition for the issuance of citations to discover assets against Tracee and various financial institutions; the circuit court granted the petition. The executors alleged that Tracee resided at the house during the last two years of Beverly's life and had access to Beverly's financial records, checkbook, and bank accounts. According to the executors, Tracee transferred money to herself without Beverly's consent or authorization.

¶ 12    The executors also filed a motion for summary judgment as to their petition to invalidate the remaining transfer instrument with respect to the house, asserting it was not properly recorded.  Tracee responded that, given the challenges posed by the COVID-19 pandemic, she acted "diligently and reasonably" to record the transfer instrument.  After a hearing, the circuit court granted summary judgment in favor of the executors and denied a counterclaim filed by Tracee (to declare the validity of the transfer instrument) in an order entered on August 8, 2023.

¶ 13    Tracee filed a motion for reconsideration—which the circuit court eventually granted— and the litigation between Tracee and the executors continued.  The executors subsequently filed a second amended petition against Tracee, seeking to invalidate the transfer instrument based, in part, on Beverly's alleged lack of capacity and Tracee's alleged exertion of undue influence.  The executors further alleged that Tracee improperly withdrew significant amounts from Beverly's financial accounts during the last few years of her life.  The record on appeal does not definitively indicate whether and/or when the circuit court ruled on the second amended petition.

¶ 14                                *Tracee's Custodial Claim*

¶ 15    In the meantime, Tracee filed a custodial claim of more than $180,000 against the estate on October 16, 2023.  Tracee maintained that she satisfied the requirements of section 18-1.1 of the Probate Act (755 ILCS 5/18-1.1 (West 2022)) by living with Beverly and dedicating herself to her disabled mother's care for more than three years prior to her death.

¶ 16    The executors filed a motion to dismiss Tracee's custodial claim pursuant to section 2-619(a)(5) of the Code (735 ILCS 5/2-619(a)(5) (West 2022)), arguing that Tracee did not file her claim by the deadline of January 5, 2023, set forth in the notices published in the Chicago Daily Law Bulletin.  Tracee responded that a "known creditor" who does not receive actual notice is not bound by the claims period set forth in the publication notice.  As she did not receive actual

notice, and her custodial claim was filed within the two-year general statute of limitations in the Probate Act (755 ILCS 5/18-12(b) (West 2022)), Tracee maintained her claim was timely.

¶ 17    The circuit court initially entered an order granting the executors' motion to dismiss the custodial claim with prejudice. With leave of court, Tracee filed an amended custodial claim, wherein she alleged that she cared for her mother from 2017 to 2021, and that the executors personally witnessed her performance of such caregiving services and knew that those services were not gratuitously provided. Tracee also filed a motion for reconsideration of the dismissal order, which the circuit court granted in part. In an order entered on August 7, 2024, the circuit court set the matter for an evidentiary hearing on August 15, 2024, "on the sole issue of whether Tracee was a known creditor in connection with" the section 2-619 motion to dismiss.

¶ 18                                    *Evidentiary Hearing*

¶ 19    During the evidentiary hearing, Joseph testified that Tracee and her two sons moved into the house with Beverly in approximately 2016. Joseph acknowledged that Tracee took care of their mother for the four-year period prior to her death in November 2021.

¶ 20    In his capacity as a trustee, Joseph reviewed Beverly's documents after her passing, including her tax returns, insurance policy, and records relating to her real estate holdings, bank accounts, and securities accounts. When Joseph examined reports from 2020 and 2021 relating to her checking account, he discovered "checks *** made out to Tracee Omilinsky for costs" which did not include Beverly's signature. According to Joseph, certain checks were cashed after Beverly's death. Joseph spoke with his co-trustee Kimberlee regarding the checks; he rejected the bank's recommendation to file a police report.

¶ 21    After Joseph coordinated with the bank "about trying to clear all my mother's debts," the five siblings participated in conference calls regarding their mother's affairs about every two

weeks commencing in January 2022. Joseph testified that he asked all his siblings what they were owed by the trust. Joseph then issued multiple checks—including a check to Tracee dated March 18, 2022—to reimburse his siblings for "funeral expenses and miscellaneous costs."

¶ 22    During the fourth or fifth family meeting in late March 2022, Tracee first informed Joseph about a transfer instrument purportedly executed by Beverly with respect to the house; she directed Joseph to "[t]alk to my lawyer." After that meeting, Joseph retained counsel. According to Joseph, Tracee never mentioned that she was owed any additional amounts from Beverly for taking care of her or that she was pursuing a custodial claim against the estate. Joseph learned of Tracee's custodial claim after the claim was filed on October 16, 2023.

¶ 23    The estate called Tracee as an adverse witness. Tracee acknowledged that she did not inform any of her siblings during the family conference calls after Beverly's passing that she was owed money for taking care of Beverly.

¶ 24    Tracee was questioned regarding multiple checks from Beverly's bank account which Tracee wrote to herself and signed herself, beginning in 2017. In a prior court filing verified by Tracee, she had admitted that these amounts were for "payment" or "reimbursement" relating to the caregiving services she provided to Beverly. While Tracee testified that she wrote herself a check each week with her mother's consent, she asserted that those amounts solely reflected the cost of a caregiver for 40 hours a week (eight hours a day, five days a week). Given that she lived with and cared for her mother more than 40 hours a week, she asserted that she was entitled to additional amounts. During the period covered by her custodial claim, Tracee acknowledged that she ran a small online business and performed invoicing for her sister's ex-husband.

¶ 25    Tracee testified that, a few days after their mother's funeral, she informed Joseph she "wanted to be compensated for the time that I took taking care of mom for the last several

years." Tracee further testified that she told Kimberlee about the conversation with Joseph and that Kimberlee responded that "she would fight for me for that." While Tracee acknowledged she was not familiar with the concept of a custodial claim when those conversations occurred, she represented that she spoke with Joseph and Kimberlee regarding "compensation."

¶ 26    Kimberlee testified that Tracee never stated during the family conference calls in early 2022 or during any conversation with Kimberlee thereafter that she intended to pursue a claim for compensation relating to her provision of caregiving services. During cross-examination, Kimberlee testified that a caregiver named Liz had worked for Beverly at an earlier time. Upon Liz's termination, Tracee performed caregiving services for Beverly, including assistance with bathing, toileting, and dressing. Kimberlee confirmed on redirect examination that Tracee did not pay rent while residing in the house.

¶ 27    Another sibling, Beckee, testified that she had contributed funds for her mother's funeral and was subsequently reimbursed with a check from the trust after submitting receipts to Joseph. Beckee testified that Tracee never mentioned during the family conference calls that she was owed money for taking care of their mother.

¶ 28    After the estate rested, Tracee testified that she and her two sons moved into the house in December 2015 after her husband's death. At that point, Tracee was a self-described "stay-at-home mom." Beginning in 2016 or 2017, Tracee helped her mother with "small simple things," such as getting into and out of the bathtub or preparing meals. As time went on, Beverly's physical limitations—and Tracee's level of assistance—steadily increased.

¶ 29    Following the termination of the hired caregiver (Liz) in May 2019, Tracee assumed her responsibilities and received her compensation. She used her mother's checking account to pay household bills and pay herself weekly compensation of $18 per hour for 40 hours. Tracee

testified, however, that she was at her mother's house "24 hours a day, seven days a week." According to Tracee, her siblings Joseph and Kimberlee observed Tracee performing caregiving services for their mother, and they knew Tracee did not have meaningful outside employment.

¶ 30    Tracee denied telling Joseph or Kimberlee that she was taking care of Beverly for free. She testified regarding a specific conversation with Joseph:

> "It was a few days after my mom's funeral.  Joe came over to the house, and we were in the dining room.  I was looking out the window, and he was on my left-hand side.  And I said, I've been taking – I want to be compensated for time that I spent with mom for the last – taking care of mom for the last several years."

Tracee testified that her brother responded that "it was his job to execute the estate, the trust as fast as possible."  According to Tracee, Kimberlee subsequently stated during a telephone conversation that she would "help [Tracee] out" and "take care of all that."  Tracee also testified about a conversation with Kimberlee after their mother's passing, wherein Kimberlee opined that Tracee "deserve[d]" compensation.  Tracee testified that she "thought my family would treat me *** with respect of saying that I put all the time in, that they would honor *** me and provide a little something."  During cross-examination, she testified that she was represented by counsel commencing in January 2022 with respect to the transfer instrument for the house, but she was unaware of the existence of custodial claims at that time and did not discuss any claims related to caregiving with counsel.

¶ 31                                   *Circuit Court Ruling*

¶ 32    After closing arguments, the circuit court entered an order on August 15, 2024, dismissing Tracee's amended custodial claim with prejudice.  In its oral ruling, the circuit court found the testimony of Joseph, Kimberlee, and Beckee to be credible.  The circuit court rejected

8

Tracee's contention that the executors did "nothing," noting that Joseph repeatedly inquired during family meetings whether debts were owed to any of the siblings. The circuit court also found that Tracee's account of her conversation with Joseph regarding caregiver compensation lacked credibility. The circuit court noted that Tracee—while represented by counsel—participated in family meetings wherein she never mentioned such a claim, even as Joseph issued checks to Tracee and the other siblings for reimbursement for funeral and other expenses. Finally, the circuit court observed that the executors knew that Tracee had already received payments for her caregiving services. Based on the foregoing, the circuit court concluded that Tracee was not entitled to actual notice. As her custodial claim was filed after the six-month deadline in the published notice, the claim was time-barred; her motion to reconsider was denied.

¶ 33    Tracee filed this timely appeal pursuant to Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016), which provides that a judgment or order entered in the administration of an estate which finally determines a right or status of a party is appealable without a special finding.

¶ 34                                      ANALYSIS

¶ 35    Tracee contends that the circuit court erred by finding that her custodial claim was not a known claim. She maintains that she was entitled to actual notice as a known creditor and therefore her custodial claim was timely, as it was filed within two years of Beverly's death. The executors challenge these contentions, arguing that Tracee was not a known creditor, and her claim was thus required to be filed by the six-month deadline set forth in the published notice. Prior to considering these arguments, however, we address the deficiencies of Tracee's brief.

¶ 36                          *Deficiencies of Tracee's Brief*

¶ 37    The executors assert that the statement of facts in Tracee's brief is "littered with improper

9

argument" and lacks certain citations to the record.[2]  We generally agree with this assessment. Illinois Supreme Court Rule 341(h)(6) requires a statement of facts to be accurately and fairly presented "without argument or comment, and with appropriate reference to the pages of the record on appeal."  Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020).  Tracee's statement of facts, however, includes "argument or comment"—*e.g.*, Tracee states that she was " 'sandbagged' at the hearing"—and does not contain consistent citations to the record.

¶ 38     The executors request that we strike or disregard specific paragraphs of the statement of facts which violate Rule 341(h)(6).  See *Wilson v. University of Chicago Medical Center*, 2023 IL App (1st) 230078, ¶ 17.  Although we have the discretion to strike portions of a brief or to dismiss an appeal based on noncompliance with the rules (*Ittersagen v. Advocate Health & Hospitals Corp.*, 2021 IL 126507, ¶ 37), we decline to do so herein, as our review is not hindered by Tracee's violations.  We will, however, disregard arguments and unsupported statements in her statement of facts.  See *Wilson*, 2023 IL App (1st) 230078, ¶ 17.  We now turn to the merits.

¶ 39                                *Section 2-619 of the Code*

¶ 40     This appeal involves a dismissal of Tracee's claim under section 2-619(a)(5) of the Code. 735 ILCS 5/2-619(a)(5) (West 2022).  A motion to dismiss pursuant to section 2-619 admits the legal sufficiency of the complaint but asserts that some affirmative matter defeats the plaintiff's claim.  *Stone Street Partners, LLC v. City of Chicago Department of Administrative Hearings*, 2017 IL 117720, ¶ 4.  Section 2-619(a)(5) provides that an action may be dismissed where it was "not commenced within the time limited by law."  735 ILCS 5/2-619(a)(5) (West 2022).

¶ 41     "The treatment of a section 2-619 motion differs depending on whether a jury demand has been filed."  *EarthMed, LLC v. Berlin*, 2024 IL App (1st) 232211-U, ¶ 20.  A dispute of

_____

[2] We observe that Tracee solely filed an opening brief and did not file a reply brief.

material fact must be left to the jury where a jury demand has been filed; in the absence of a jury demand, the court may determine factual issues by conducting an evidentiary hearing. *Id.*; 735 ILCS 5/2-619(c) (West 2022). In this case, Tracee expressly waived her right to a jury, and the circuit court held an evidentiary hearing on the issue of whether she was a known creditor. "Where the court grants a section 2-619 motion to dismiss following an evidentiary hearing, we review whether the court's factual findings are against the manifest weight of the evidence and we review questions of law *de novo*." *EarthMed, LLC*, 2024 IL App (1st) 232211-U, ¶ 20. See *Offord v. Fitness International, LLC*, 2015 IL App (1st) 150879, ¶ 15; *Hernandez v. New Rogers Pontiac, Inc.*, 332 Ill. App. 3d 461, 464 (2002).

¶ 42   Tracee maintains that the circuit court made a "clear error of law" which "tainted" its findings. According to Tracee, a motion to dismiss under section 2-619 "*must* be supported by an affidavit." (Emphasis in original.) Section 2-619 provides, in part:

> "*** (a) Defendant may, within the time for pleading, file a motion for dismissal of the action or for other appropriate relief upon any of the following grounds. If the grounds do not appear on the face of the pleading attacked the motion shall be supported by affidavit." 735 ILCS 5/2-619(a) (West 2022).

Given that the circuit court did not require the executors to file an affidavit in support of their motion to dismiss, Tracee claims she was "sandbagged in the evidentiary hearing in that she had no idea of the purported factual basis of the Estate's motion to dismiss until the witnesses testified." We reject this contention for multiple reasons. The plain language of section 2-619 does not support her sweeping generalization that an affidavit always "must" be filed. Indeed, as the timing defect was apparent on the face of the custodial claim—*i.e.*, the file-stamped date of October 16, 2023—the executors were not required to support the dismissal motion with an

affidavit. We further observe that Tracee initially advanced the argument that she was a known creditor. The circuit court subsequently entered an order scheduling an evidentiary hearing "on the sole issue of whether Tracee was a known creditor in connection with" the motion to dismiss. Based on the foregoing, we are unmoved by Tracee's contention that she "had no idea" about the basis for the section 2-619 motion prior to the witnesses' testimony at the hearing.

¶ 43                    *Custodial Claims and Notice Under the Probate Act*

¶ 44    Tracee filed a statutory custodial claim against her mother's estate under section 18-1.1 of the Probate Act. 755 ILCS 5/18-1.1 (West 2022). Section 18-1.1 provides, in part, that a spouse, sibling, parent, or child of a disabled person who "dedicates himself or herself" to their care "by living with and personally caring for the person" for at least three years is entitled to a claim against the estate upon the disabled person's death. *Id.* See *Estate of Mendelson v. Mendelson*, 2016 IL App (2d) 150084, ¶ 28. The Illinois Supreme Court has observed that this section of the Probate Act "laudably recognizes the often unseen and intangible sacrifices made, and opportunities forgone, by immediate family members who commit their lives every day to making the lives of disabled persons better." *In re Estate of Jolliff*, 199 Ill. 2d 510, 517 (2002).

¶ 45    Section 18-1.1 sets forth minimum claim amounts based on the nature and extent of the person's disability, *e.g.*, a 100% disability entitles the caregiver to a $180,000 claim, subject to the availability of estate assets. 755 ILCS 5/18-1.1 (West 2022). See *Estate of Jolliff*, 199 Ill. 2d at 525-26 (observing that the "statutory amounts are a reasonable lower limit for such a commitment and ***serve the legislative goal of encouraging immediate family members to commit themselves to disabled relatives"). A court may reduce this amount, however, based on various factors, including the provision of free or low cost housing to the claimant and the alleviation of the need for the claimant's full-time employment. 755 ILCS 5/18-1.1 (West 2022).

¶ 46　As discussed above, the circuit court found that Tracee's custodial claim was untimely as it was not filed by the six-month deadline set forth in the published notice—January 5, 2023. Section 18-3(a) of the Probate Act provides as follows:

> "It is the duty of the representative to publish once each week for 3 successive weeks, and to mail or deliver to each creditor of the decedent whose name and post office address are known to or are reasonably ascertainable by the representative and whose claim has not been allowed or disallowed as provided in Section 18-11, a notice stating the death of the decedent, the name and address of the representative and of his attorney of record, that claims may be filed on or before the date stated in the notice, which date shall be not less than 6 months from the date of the first publication or 3 months from the date of mailing or delivery, whichever is later, and that any claim not filed on or before that date is barred." 755 ILCS 5/18-3(a) (West 2022).

Section 18-3(a) thus authorizes notice by publication to the unknown creditors of an estate and requires the mailing or delivery of a notice to each creditor of the decedent whose name and address are known or reasonably ascertainable. *Jaason v. Sullivan*, 389 Ill. App. 3d 376, 379 (2009). As section 18-3 requires an estate's representative to mail or deliver notice to all known creditors (*id; In re Estate of Zivin*, 2015 IL App (1st) 150606, ¶ 10), Tracee maintains that the estate's notice by publication was inadequate. Given that section 12(b) of the Probate Act establishes an outer limit for filing claims of two years after the decedent's death (755 ILCS 5/18-12(b) (West 2022))—and Beverly died on November 14, 2021—Tracee asserts that her October 2023 custodial claim was timely filed. See *In re Estate of Beider*, 268 Ill. App. 3d 1094, 1096 (1994) (noting that section 18-12 "was adopted for the purpose of facilitating early settlement of estates"); *In re Marriage of Epsteen*, 339 Ill. App. 3d 586, 596 (2003) (same).

¶ 47                                    *Known Creditor*

¶ 48    The circuit court conducted an evidentiary hearing on the dispositive issue—whether Tracee was a known creditor of Beverly's estate—and found that she was not a known creditor and was thus not entitled to actual notice.  "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented."  *Offord*, 2015 IL App (1st) 150879, ¶ 16. As discussed below, we cannot conclude that the circuit court's finding that Tracee was not a known creditor was against the manifest weight of the evidence.

¶ 49    Citing *In re Estate of Anderson*, 246 Ill. App. 3d 116 (1993), Tracee appears to suggest that the executors (Joseph and Kimberlee) failed to exercise reasonable diligence in determining the existence of known or reasonably ascertainable creditors of the estate.  The circuit court rejected this suggestion, as do we.  The hearing testimony revealed that the executors— particularly Joseph—made a "good-faith search" (*id.* at 130) of their mother's financial and legal records and coordinated with the bank to determine the debts of the estate and to marshal the estate's assets.  Among other things, Joseph examined Beverly's credit union account, bank accounts, and stock accounts, and subsequently reviewed bank records from 2020 and 2021 with a bank manager.  Following his communications with the bank, Joseph organized multiple meetings with his siblings regarding their mother's debts.  We agree with the circuit court's assessment that the executors in this case "made reasonable inquiries."

¶ 50    During the family meetings, Tracee admittedly never mentioned that she held a custodial claim or any claim relating to her mother's care.  Based on our review of the record, the executors had no rational reason to otherwise know that Tracee possessed such a claim. While Tracee maintains that her siblings were aware that her caregiving services were not

performed gratuitously, Joseph's investigation revealed that Tracee had written numerous checks to herself from her mother's account as payment for her provision of caregiving services—seemingly indicating she had already been compensated for those services. Although Joseph issued checks to Tracee and other siblings in March 2022 as reimbursement for funeral expenses and "miscellaneous costs," Tracee never indicated she was owed any additional amounts, even though she was already represented by counsel regarding the transfer instrument for the house.

¶ 51    We observe that the circuit court found the testimony of Joseph, Kimberlee, and Beckee to be credible but did not find Tracee's account of her private conversation with Joseph about caregiver compensation to be credible. As the trier of fact, the circuit court was "responsible for resolving any factual disputes, judging the credibility of the witnesses, determining the weight to afford their testimony and deciphering contradicting evidence." *Bernstein & Grazian P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 976 (2010). Under the manifest weight standard, we defer to the circuit court's factual findings, as it was in the best position to observe the conduct and demeanor of the parties. *Offord*, 2015 IL App (1st) 150879, ¶ 16.

¶ 52    Based on the foregoing, the circuit court's determination that Tracee was not a known creditor—and thus publication notice was adequate, and her custodial claim was untimely—was not against the manifest weight of the evidence.

¶ 53                                        CONCLUSION

¶ 54    The judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 55    Affirmed.