No. 2--05--0927

_____

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

_____

| | |
|---|---|
| <u>In re</u> ESTATE OF REX B. LOWER,) | Appeal from the Circuit Court |
| Deceased ) | of Carroll County. |
| ) | |
| ) | No. 03--P--53 |
| ) | |
| ) | Honorable |
| (State Bank, Petitioner-Appellant, v. ) | Val Gunnarsson, |
| Mary Jean Lower, Respondent-Appellee). ) | Judge, Presiding. |

_____

_____

JUSTICE O'MALLEY delivered the opinion of the court:

Petitioner, State Bank, appeals the decision of the circuit court of Carroll County granting respondent's, Mary Jean Lower's, statutory custodial claim of $100,000 against the estate of her deceased husband, Rex B. Lower.  On appeal, petitioner argues that the trial court erred in finding that Rex was disabled and in concluding that respondent dedicated herself to his care, both as required under the custodial claim statute.  See 755 ILCS 5/18--1.1 (West 2004).  For the reasons that follow, we affirm.

In 2002, petitioner filed a claim against Rex in the amount of $35,146.40 for the unpaid portion of grain contracts petitioner obtained as security for the outstanding loans of a company that is not a party to this action.  Rex passed away on August 25, 2003, while petitioner's claim against him was still pending.  On November 7, 2003, Rex's will was admitted into probate, and respondent  filed a statutory custodial claim in the amount of

$100,000 against his estate. See 755 ILCS 5/18--1.1 (West 2004). The trial court granted the claim on November 7, and petitioner, which was entitled to recovery on its claim only to the extent that any money remained after respondent's claim was paid (see 755 ILCS 5/18--10 (West 2004)), later filed a motion to vacate the order. The trial court granted the motion to vacate, and respondent subsequently filed an amended statutory custodial claim on February 16, 2005. On August 12, 2005, the trial court conducted a bench trial regarding the amended statutory custodial claim.

Pamela Dunlavey testified first for respondent. She testified that she had met Rex approximately 10 to 15 years earlier, and she worked from 1998 to 2003 as a caretaker for Rex, who had been diagnosed in 1991 with Parkinson's disease. She testified that she followed respondent's instructions in carrying out her duties:

"[Respondent] was there always and she would have what was to be made for the meals, what his laundry was to be done, where it was to be put, what he would wear that day, when he would get up, the care of *** [a machine that assisted him in breathing].

* * *

The care and cleaning of that [machine], she would be right there, but we would physically have to do it. She would instruct us."

Dunlavey recalled that, in 1998, respondent suffered a stroke that affected her speech and weakened one of her legs. Respondent conducted all of her therapy after her stroke at home so that she could be with Rex. Dunlavey described petitioner's participation in Rex's care after her stroke as follows:

"[Respondent] was constantly in attendance and making sure that [Rex] had quality care, that all of the jobs were done correctly, [t]hat his food was served when he was still eating, the amounts that were served, that things were cleaned up, *** that he had clean clothes, *** that if need be someone was there to help [with] his shower, that all of his appointments were taken care of, *** and [that] instructions *** from the physicians [were] carried out, *** that his medications were administered correctly."

Respondent also attended all the bills and finances for the household.

On cross-examination, Dunlavey recalled that respondent and Rex employed a young woman at their home for approximately one year before Dunlavey began work for them, and the woman would work "a few" hours a day performing tasks such as cleaning around the home. When Dunlavey started working for Rex in 1998, he was able to help make decisions around the house, but he eventually lost the ability to communicate and respondent took full control of the decision-making. Dunlavey also testified that, after respondent suffered her stroke, Dunlavey would help her with showering. Dunlavey would also drive the Lowers or run various errands for them, because neither of them was able to drive. After her stroke, respondent would still assist in her husband's care by laying out his clothing, putting away groceries, laying out his medications, helping him get dressed, and instructing caregivers when tasks requiring more physical exertion arose.

Dunlavey indicated that respondent gave up social activities after Rex's condition began to deteriorate, because, if Rex could not attend, she would stay home with him. Respondent was with Rex "twenty-four hours [a day], seven days a week." Dunlavey

observed that, as Rex's condition deteriorated, the experience became very emotionally draining for respondent and that respondent's sleep was affected.

Dunlavey estimated that respondent gave up her occupation of raising dogs around the time Dunlavey began working for the Lowers in 1998. Dunlavey said that respondent was still able to attend family functions after her stroke, but she nevertheless stayed home with Rex when he was unable to attend.

Mary Robertson testified next for respondent. She worked as a caretaker for the Lowers from March 2001 through August 2002. Her duties in the house consisted of cooking, bathing, washing clothes, housework, and otherwise helping Rex or respondent. Robertson worked at respondent's instruction. Respondent was there "all the time." Though Rex was able to eat when Robertson first began working for the Lowers, he began feeding through a stomach tube by the time she stopped working for them. Respondent would oversee these feedings. Generally, if Rex tried to get up or otherwise appeared to need assistance while Robertson was in another room, respondent would yell to summon Robertson for help. Respondent would also make sure that Rex took his prescribed medication at the proper times, and she would oversee household tasks such as bill paying. Robertson noticed that respondent was often tired and showed signs of strain as a result of Rex's poor health.

On cross-examination, Robertson stated that the Lowers always had a caretaker at their home, even at night, and that Robertson typically worked an eight-hour shift during the day at the Lower home. She recalled that she helped Rex stand and walk and that respondent was unable to help physically with those tasks. However, respondent gave her general instructions regarding the tasks she was to perform, including when she was

supposed to vacuum, do laundry, change the bedding, and prepare meals. Robertson recalled that respondent spent all of her time with Rex.

Deivis Baltuisaitis testified next for respondent. He worked for Rex for two years, starting September 24, 2001, and ending August 11, 2003. His duties included doing laundry, housekeeping, preparing food and medicine, and feeding Rex through a tube. He stated that he also assisted respondent by helping her prepare food. Baltuisaitis was on duty 24 hours a day to give care to Rex, and he stayed in the Lowers' home overnight. He said that respondent, who slept in the same room as Rex, called him to their bedroom four to six times per night to help Rex with various things, including going to the bathroom, taking medicine, getting food, or using a suction machine to remove saliva from his mouth. Baltuisaitis recalled that respondent was with Rex "every minute," and, if he was tending to another matter in another room while Rex needed something, she would call for Baltuisaitis to come help. Baltuisaitis was unable to communicate with Rex due to the impairment in his speech from Parkinson's disease, so he would have to talk to respondent in order to determine what Rex's needs were. He said that respondent controlled Rex's care, and he agreed that she was "a pain" sometimes because she was "so on top of it." Baltuisaitis said that respondent was able to socialize with visitors when they came to the house. However, he testified that Rex's condition affected her emotionally and made her "very upset."

On cross-examination, Baltuisaitis testified that he was available to care for Rex 24 hours a day because respondent was unable to provide the care on her own. He stated that respondent would summon him to her and Rex's bedroom in the middle of the night by yelling and that Rex never called for him because he was unable to. He agreed that

respondent was upset about her own physical condition and that it interfered with her ability to help her husband.

Baltuisaitis agreed that respondent did not physically help with Rex's care but that she was in control, and she would try to understand what her husband was trying to communicate so that she could relay that information to Baltuisaitis. He also stated that respondent controlled the timing of Rex's meals and medicine. When he tended to his other duties around the house, respondent would stay with Rex. Baltuisaitis testified that he would not say that respondent had "much of a social life," because she chose to stay with Rex at their home instead of leaving the house. On redirect examination, Baltuisaitis recalled that the Lowers received visitors in their home while he worked there.

Respondent next called Rex's nephew, Dean Lower, to testify. Dean recalled that he visited the Lowers approximately once every two months in the time period between 1998 and 2003. He testified that he was mostly unable to communicate with Rex, but he would converse with respondent about Rex's condition and other matters. On several occasions, he observed respondent summoning a caretaker because of concerns with Rex's activities. Dean stated that respondent stopped raising dogs because she became physically unable to handle them. On cross-examination, he testified that respondent and Rex were unable to live at home alone together for the last four years of Rex's life. He also testified that he never saw respondent cook, wash clothes, dress her husband, or give her husband medications during his visits between 1999 and 2003, but he explained that he heard her issue orders to others to perform those functions. Dean testified that respondent's social life was limited to interaction with people who visited her at her home, partially because of her condition and partially because of Rex's condition.

Respondent next called respondent and Rex's son, Michael Lower, to testify. He testified that he served as a backup caregiver during Baltuisaitis's vacations. He described his duties as caregiver as providing physical support for his father when Rex tried to walk, helping feed and medicate Rex, and helping with normal "self-hygiene" tasks. He testified that, when he acted as caregiver, respondent monitored all of Rex's feedings and medications so that they were all administered at the proper times, and that she would summon him six or eight times per night to assist Rex with various problems. He stated that he provided respondent some help as well by taking her to appointments.

Michael testified that respondent was involved in raising dogs until she began downsizing the business in 1997. At the time of her stroke, she had only five dogs, as opposed to the 50 or 100 litters per year she had before 1997. Michael said that respondent gave up the business in order to care for Rex. He also said that his mother received medication for depression brought on by dealing with Rex's illness. On cross-examination, Michael agreed that his parents paid caregivers from 1998 forward because they were not able to live alone. He also said that Rex went with him on trips to Colorado and Florida in each of the years from 2000 to 2003, and, while they were gone, someone usually came over to help or check up on respondent during the day. Michael testified that he thought Rex declined significantly around 1996 or 1997, and, in 1998, Michael and respondent were able to convince him to stop driving. He stated that he thought Rex's condition "contributed importantly to [respondent's] depression" and was also an "important" cause of her stroke.

The parties stipulated to have an evidence deposition of Dr. David L. Reese admitted as testimony. Reese was Rex's physician from 1983 until Rex's death in August

2003.  Reese believed that he diagnosed Rex with Parkinson's disease in 1991.  He described Parkinson's disease as a "progressive disease," which can be classified as mild, moderate, or severe.  Reese said that, at the early parts of his progression, Rex was fairly self-sufficient, but his condition progressed to the point where he needed help with daily living, and, at the end of his life, his condition was "fairly severe."  Because the progression of the disease is a gradual process, Reese could not give a specific date  when Rex's condition became more severe, but he stated that Rex required a feeding tube "around 2001, 2002."  Reese also estimated that Rex was unable to take care of his medication himself "for at least three years before he passed away."  Reese agreed that it was his opinion that Rex was disabled, and he recalled writing a letter on September 12, 2002, stating that Rex had required around-the-clock care for "several years."  Based on that letter, Reese estimated that Rex probably became disabled around 1999.

On cross-examination, Reese stated that respondent, for whom he was also the treating physician, suffered a stroke on May 16, 1999, and it left her paralyzed or extremely weak on the right side of her body.  Reese said that respondent was not physically able to care for her husband after the stroke.  He also said that respondent was depressed and frustrated due to her situation.  When asked if respondent would have been able to assist in the care of her husband after her stroke, Reese stated that she could not have physically assisted in his care, but she was in a position to give him emotional support.  He stated that he did not know if respondent woke up in the middle of the night if Rex needed something or if she otherwise notified the caregiver of his needs, but she would have been physically able to do those things.  He agreed that, after her stroke, respondent could also have been considered disabled.

The trial court took a recess to consider the evidence and then found that Rex was 100% disabled as of 1998, when he was no longer able to operate a car and suffered other symptoms. The trial court stated that Rex deteriorated even further over the last three years of his life.

The trial court also found that respondent abandoned her social life and her interest in raising dogs so she could care for Rex and that she provided "direction and control at every instance" of Rex's care. The court found that the effect of her dedication was "emotional wear and tear" and "physical drain" that left her "thoroughly exhausted." The court further found that the caretakers "could not have functioned without [respondent] to translate, to communicate, to know his wants and needs and to watch him and to direct them." Thus, the trial court found that she dedicated herself to Rex's care, and it granted her statutory custodial claim. Petitioner timely appeals.

Respondent's statutory custodial claim arises out of section 18--1.1 of the Probate Act of 1975 (Act) (755 ILCS 5/18--1.1 (West 2004)), which provides:

"Any spouse, parent, brother, sister, or child of a disabled person who dedicates himself or herself to the care of the disabled person by living with and personally caring for the disabled person for at least 3 years shall be entitled to a claim against the estate upon the death of the disabled person. The claim shall take into consideration the claimant's lost employment opportunities, lost lifestyle opportunities, and emotional distress experienced as a result of personally caring for the disabled person. *** The claim shall be based upon the nature and extent of the person's disability and, at a minimum but subject to the extent of the assets available, shall be in the amounts set forth below:

1. 100% disability, $100,000

2. 75% disability, $75,000

3. 50% disability, $50,000

4. 25% disability, $25,000."

Petitioner's first argument is that the trial court erred in finding that Rex was 100% disabled for three years.  In countering that argument, respondent relies on the definition of "disabled person" found in section 11a--2 of the Act (755 ILCS 5/11a--2 (West 2004)), and petitioner does not object to applying that definition to section 18--1.1 of the Act.  Therefore, we adopt the definition of a disabled person found in section 11a--2 of the Act, which states in pertinent part:

> " 'Disabled person' means a person 18 years or older who (a) because of mental deterioration or physical incapacity is not fully able to manage his person or estate ***."  755 ILCS 5/11a--2 (West 2004).

At oral argument, both parties argued that the underlying specific facts of how much care Rex needed were undisputed and that the ultimate conclusion of whether he was 100% disabled under the statute presents a question of law subject to <u>de novo</u> review.  Indeed, we can see the logic of deferring to the trial court's expertise in resolving factual matters but reviewing <u>de novo</u> its ultimate conclusion of whether the facts as established meet the statutory threshold for disability.  See K. Coles, <u>Mixed Up Questions of Fact and Law: Illinois Standards of Appellate Review in Civil Cases Following the 1997 Amendment to Supreme Court Rule 341</u>, 28 S. Ill. L.J. 13, 38-43 (2003) (advocating functional approach to standard of review, which predicates standard of review on expertise of court).  However,

˘10˘

we need not explore this argument further, because the supreme court has clearly stated that the percentage of disability is a factual question, and we follow that pronouncement.[1] See In re Estate of Jolliff, 199 Ill. 2d 510, 526 (2002) ("the percentage of disability [is a] fact question[] for the jury"). Accordingly, we will not reverse the trial court's conclusion that Rex was 100% disabled for the last three years of his life unless it is contrary to the manifest weight of the evidence. See Franz v. Calaco Development Corp., 352 Ill. App. 3d 1129, 1139 (2004) (questions of fact receive manifest-weight review).

The evidence that Rex was 100% disabled for at least three years is overwhelming. He retained caretakers to assist him at his home from 1998 until his death, and each of the caretakers, along with his treating physician, opined on the amount of assistance he required and his inability to be left alone in the house. Dr. Reese also offered his

---

[1]The approach the parties advocate would become more difficult in reviewing jury verdicts, which generally receive manifest-weight review, even though they often resolve questions of law along with the questions of fact they are normally considered to address. See T. O'Neill & S. Brody, Taking Standard of Appellate Review Seriously: A Proposal to Amend Rule 341, 83 Ill. B.J. 512, 514 (1995). It would be very difficult to parse a jury's verdict into its factual and legal components without the separate explanation of findings that often accompanies a bench ruling. Perhaps the solution would be to consider what type of facts, as a matter of law, would suffice to show disability, and then to determine whether a jury's finding that such facts existed in a particular case was against the manifest weight of the evidence. However, again, given the supreme court's pronouncement, this discussion becomes moot.

conclusion that Rex had been disabled since 1999. Based on this evidence, and the paucity of evidence to the contrary, we agree with the trial court's finding that Rex was 100% disabled for at least three years before his death.

Petitioner's next contention is that respondent did not meet the statutory requirement of "dedicat[ing] *** herself to the care of the disabled person by living with and personally caring for the disabled person for at least 3 years." 755 ILCS 5/18--1.1 (West 2004). Petitioner urges that de novo review applies to this contention because it presents an issue of statutory construction. See Brown Brothers Harriman Trust Co., LLC v. Bennett, 357 Ill. App. 3d 399, 402-03 (2005) (statutory interpretation presents a question of law and is reviewed de novo). Inexplicably, respondent agrees with the application of de novo review to all issues on appeal, because the facts are "basically uncontroverted" and "the real issue is the Trial Court's application of the law to [the] facts."[2]

---

[2]Respondent's assertion that the facts are basically undisputed becomes more strange in light of petitioner's highly biased portrayal of the facts, as discussed more fully below.

Both parties oversimplify the issues presented. The contention that respondent did not meet the statutory requirements here presents two discrete issues: first, whether the trial court erred in its interpretation of the statutory requirements of section 18--1.1 of the Act, and, second, whether the trial court erred in its finding that respondent met those requirements. Whether the facts are disputed on appeal may change the result of these inquiries, but it does not change the inquiries themselves and thus does not change the standards of review. The first issue presents a legal question of statutory interpretation, which we review de novo. See Bennett, 357 Ill. App. 3d at 402-03. The second question, however, presents a challenge to the trial court's finding of fact, which we review under the manifest weight standard. See Corral v. Mervis Industries, Inc., 217 Ill. 2d 144, 154 (2005) ("[w]e will not disturb a trial court's findings of fact unless those findings are against the manifest weight of the evidence").

The language of section 18--1.1 of the Act is quoted above. Petitioner argues that the Act requires that, in order to qualify for a statutory custodial claim, a claimant have physically provided the care to the deceased. Thus, according to petitioner, a claimant who was incapable of physically providing the requisite care to the deceased, or who relied on the assistance of other caretakers, would not qualify under section 18--1.1. We disagree.

"The primary goal of statutory construction is to ascertain and give effect to the intent of the legislature, and the most reliable indication of the legislature's intent is the plain language of the statute." Pietro v. Marriott Senior Living Services, Inc., 348 Ill. App. 3d 541, 546 (2004). "When a statute's language is clear, it will be given effect without resort to other aids of statutory construction." Pietro, 348 Ill. App. 3d at 546. A court must not depart from the plain language of a statute by reading into it exceptions, limitations, or

conditions that the legislature did not express. Estate of Henry v. St. Peter's Evangelical Church, 337 Ill. App. 3d 246, 250 (2003). Here, there is no language in the statute indicating that, in order to qualify under section 18--1.1, the claimant must have provided all physical care to the deceased. In fact, our supreme court has indicated just the opposite by declaring that to succeed in a section 18--1.1 claim, a claimant need not have been the exclusive caregiver. See Jolliff, 199 Ill. 2d at 527 ("more than one immediate family member may make a statutory custodial claim if more than one meets the requirements of section 18--1.1"). Accordingly, we reject petitioner's argument that the statute requires that a successful claimant must have provided all care to the deceased. For the same reasons, we also reject petitioner's argument that under section 18--1.1 the care provided must have been physical in nature.

Contrary to respondent's assertion that the facts are basically undisputed, petitioner does dispute the viability of the trial court's factual conclusion that respondent met the requirements of section 18--1.1. However, based on our reading of the statute, there can be little question that the trial court's finding that respondent dedicated herself to Rex's care for at least three years was not against the manifest weight of the evidence. All of the caretakers who testified opined that respondent spent all of her time watching Rex and monitoring his needs, and the testimony indicated that she was the only person able to communicate his needs to the caretakers. There was also testimony that she slept next to him and awoke several times each night to alert Rex's caretaker to problems Rex was having. Thus, the testimony indicated that, despite her physical inability to perform many of the tasks, she was integral to Rex's care and dedicated herself to overseeing that care.

No. 2--05--0927

See Jolliff, 199 Ill. 2d at 517, quoting Webster's Third International Dictionary 589 (1993) (" 'dedicate' means 'to commit to something as a constant goal or way of life' ").

Petitioner argues that respondent's loss of social life, divestment from her dog raising business, and depressed emotional state were at least partially a result of her suffering a stroke, and thus any "lost employment opportunities, lost lifestyle opportunities, and emotional distress" (755 ILCS 5/18--1.1 (West 2004)) were not entirely due to her dedicating herself to Rex's care. Whether a claimant suffered those three things is probative, but a claimant may recover even if her dedication to caring for the deceased did not lead to those three problems. In re Estate of Rollins, 269 Ill. App. 3d 261, 271 (1995). Even assuming respondent suffered none of those three problems as a result of her caring for Rex, there was substantial evidence concerning her dedication to caring for Rex. In any event, there was also sufficient evidence presented that her decrease in social activities and her depression were primarily caused by her caring for Rex, and, accordingly, even if we were to accord more weight to those three factors, the trial court's finding still would not be contrary to the manifest weight of the evidence.

In closing, we are compelled to digress for comment on petitioner's inaccurate recitation of the facts and record in this case. For example, petitioner states as follows: "Dr. Reese stated that to the best of his recollection he could not say if Rex was disabled." Petitioner then cites the following passage from Reese's deposition:

"Q. Based on your evaluations of Mr. Lower, and I assume you talked to other people to gain information on what they're seeing as far as his symptoms are concerned, are you able to have an opinion to a reasonable degree of medical certainty that he was disabled?

˘15˘

A. Yes.

Q. Okay. At what point, to the best of your recollection, do you feel he was disabled?

A. To the best of my recollection, I can't say. I know that I wrote a long letter to somebody at one point, maybe Medicare or some other situation. At that point I mentioned that he was--let me see if I can find the letter. This was a letter related to something with the Internal Revenue Service. Rex Lower was diagnosed with Parkinson's Disease eleven years ago, and this was dated September 12th of 2002. No known cure for this progressively debilitating neurological disorder. He's expected to result in death. He's required around-the-clock care for several years, and this was written in 2002."

Not only does the above-quoted passage fail to support the proposition for which petitioner cites it, it directly refutes the proposition for which petitioner cites it. At oral argument, petitioner argued that the above statement from its brief was accurate, because Reese could not say that Rex was "100%" disabled. However, the statement from petitioner's brief does not say that Reese never testified to 100% disability; it says that Reese could not say if Rex was disabled. The statement in the brief is untrue.

Elsewhere, petitioner states that "Reese *** testified that while [respondent] may have been depressed about the condition of Rex, she was equally upset and depressed about her own condition." The testimony petitioner cites as the source of this assertion is as follows:

"Q. Did she recover any from that stroke? Was she still able to function cognitively, for example?

A. To the best of my recollection, she was able also to communicate very slowly, I believe very difficult to understand because of speech, and I think she was depressed, I think she was frustrated due to her situation. As far as recovering, the ability to speak the way she used to, that never came back."

The cited material does not approach an assertion that respondent was "equally upset and depressed about her own condition" compared to her level of depression due to her husband's condition--indeed, the cited testimony makes no reference to her husband's condition. At oral argument, petitioner conceded that the use of the word "equally" was improvident and suggested that "also" might have been more accurate. We agree, but the two words are hardly interchangeable. As written, petitioner's statement is false.

We remind petitioner of the duty under Supreme Court Rule 341(e)(6) to file a statement of facts "stated accurately and fairly" (Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(6), eff. October 1, 2001), and we express our disapproval of the inaccurate statement of facts petitioner submitted in this case. We also disapprove of respondent's failure to bring these inaccuracies to our attention.

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

BOWMAN and CALLUM, JJ., concur.