2016 IL App (2d) 150084
No. 2-15-0084
Opinion filed March 8, 2016

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE ESTATE OF DIANE MENDELSON, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Petitioner and | ) | |
| Counterrespondent-Appellee, | ) | |
| | ) | |
| v. | ) | No. 11-P-919 |
| | ) | |
| MICHAEL MENDELSON, | ) | |
| | ) | Honorable |
| Respondent and | ) | Michael J. Fusz, |
| Counterpetitioner-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Zenoff and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1     The instant controversy arises primarily from a dispute as to whom the decedent, Diane Mendelson, intended to inherit her Highland Park home. In 2005, she signed a deed that placed the home in joint tenancy with her son Michael Mendelson. In 2006, she prepared a trust that divided her estate (including the home) equally among her four sons. In 2011, three months before she died, she revoked the 2006 trust and created a new trust that indicated, among other things, that Michael was to receive the home via the 2005 joint tenancy deed. After the decedent's death, the circuit court of Lake County considered competing claims between Michael and his three brothers as to their interests in the Highland Park home and determined

that the four brothers had equal interests in the home. The trial court also rejected Michael's claim that he was entitled to compensation for the care that he provided to the decedent prior to her death.

¶ 2    On September 9, 2015, this court entered an opinion determining that the trial court properly rejected Michael's claim for compensation but erred in not awarding him a 100% interest in the Highland Park home. This court held that the decedent conveyed a 100% interest in the home to Michael via her 2011 trust. We therefore reversed the trial court's decision, which found that Michael was entitled to 25% of the Highland Park home. On October 14, 2015, the decedent's estate filed a petition for rehearing. Upon considering that petition, as well as Michael's response and the estate's reply, we now determine that the decedent intended to convey to Michael an interest in her home only via the 2005 joint tenancy deed, not via the 2011 trust. As that deed was not valid, Michael was in fact entitled only to 25% of the Highland Park home. We therefore grant the petition for rehearing and now affirm the trial court's decision.

¶ 3                                    BACKGROUND

¶ 4    The decedent had four sons: Robert, Michael, Ronald, and Daniel Mendelson. She owned and lived at a home located at 1509 Arbor Avenue in Highland Park. In 2004 or 2005, Michael, along with his girlfriend and his two children, moved in with the decedent.

¶ 5    On July 15, 2005, the decedent executed a deed to her home, placing it in joint tenancy with herself and Michael as the joint tenants (the 2005 deed). Neither the decedent nor Michael recorded the deed during the decedent's lifetime. Michael explained that the decedent was a senior citizen who received a property tax benefit, allowing her to defer payment of a substantial portion of those taxes. Both Michael and the decedent were concerned that if she recorded the deed she would lose that property tax benefit.

¶ 6      On June 16, 2006, the decedent signed estate planning documents prepared by attorney Larry Magill. The documents included: (1) a last will and testament; (2) the Diane Mendelson Living Trust, dated June 16, 2006 (the 2006 trust); (3) a Property Power of Attorney; (4) a Health Care Power of Attorney; (5) a Living Will; and (6) a Deed in Trust (the 2006 deed). The 2006 deed transferred the Highland Park home from the decedent to the 2006 trust. The 2006 trust provided that, after her death, her estate was to be divided equally among her four sons. On September 18, 2006, the 2006 deed was recorded with the Lake County Recorder of Deeds. Magill testified that the decedent never told him that she had placed her home in joint tenancy with Michael. Rather, she told him that Michael had been pressuring and threatening her to sign some documents that she had not read and did not understand. She also told him that she wanted to be even and fair to her four sons and wanted to leave her property to her sons in equal shares.

¶ 7      In March 2011, the decedent refinanced the mortgage on the Highland Park home through Fifth Third Bank. In the refinancing settlement statement, she listed herself as the sole owner of the property.

¶ 8      On July 1, 2011, the decedent executed a new trust (the 2011 trust). The 2011 trust designated the decedent as trustee and Michael as successor trustee. The 2011 trust stated that it revoked any and all prior trusts. The 2011 trust also provided in relevant part:

"Article 3

Gifts on My Death

On my death, the trustee shall distribute the following gifts from the trust estate:

3.1 Tangible Personal Property. ***

3.2 Gifts of Remaining Tangible Personal Property. ***

3.3 Gift of Balance of the Trust Estate. ***

3.4  Real-Property.  On July 14, 2005 I had quit-claimed the property located at 1509 Arbor Avenue Highland Park, Illinois, to my son, Michael Mendelson, in Joint Tenancy with the Right of Survivorship as such it was my intent at that time as it is my intent today (*i.e.* the execution of this instant Living Trust) that the real property, located at 1509 Arbor Avenue Highland Park, Illinois, upon by [*sic*] death shall become the sole and exclusive property of my son, Michael Mendelson.

3.5  Survivorship.  ***"

¶ 9     On October 1, 2011, the decedent died.

¶ 10    On October 5, 2011, Michael recorded the 2005 deed.  On November 14, 2011, Michael recorded the 2011 trust along with a deed identical to the 2005 deed.

¶ 11    On November 22, 2011, the decedent's estate filed a petition to determine the proper distribution of the Highland Park home.  The petition requested that the court declare the real property to be legally titled in the name of the 2006 trust, or, in the alternative, if the trial court declared the 2006 trust revoked, that the property be subject to probate and distributed according to the laws of intestacy.

¶ 12    On February 12, 2012, Michael filed a custodial care claim against the estate pursuant to section 18.1-1 of the Probate Act of 1975 (755 ILCS 5/18.1-1 (West 2012)).  Michael sought $125,000 for the personal care that he provided to the decedent.

¶ 13    On March 19, 2012, Michael filed a counterpetition to determine the disposition of the Highland Park home.  He claimed that the 2005 deed and the 2011 trust entitled him to ownership of that home.  The counterpetition further alleged that he had paid the mortgage, real estate taxes, and upkeep and remodeling of the home out of his own funds from March 2004 through the date of the filing of the counterpetition.

¶ 14    From April 21 to May 9, 2014, the trial court conducted a hearing on the parties' competing petitions.  As to the Highland Park home, Michael testified that, in lieu of rent, the decedent had him pay the monthly mortgage of $527.  This was less than he had been paying for a one-bedroom apartment in Chicago ($599).

¶ 15    Michael testified that he cooked meals for the decedent daily, that he made breakfast for her every morning, and that he assisted her in cleaning the house and doing laundry.  The decedent stopped driving during the last three or four years of her life.  After that, he took her to physical therapy sessions about 12 times per month.  He helped her take medications, took her shopping, helped her with laundry, and ran errands for her.

¶ 16    Daniel testified that he lived about 15 minutes from the decedent and that he visited her about once a week.  He believed that, between 2006 and 2011, she was not eating with Michael or his family and no one was preparing her food, because she had asked him (Daniel) to order her Meals on Wheels.  On 10 occasions from 2006 to 2011 when he was there at dinner time, he observed that she had already eaten and was in her room.  He never saw her eat with the family on those occasions.  She had a home caretaker/companion from Catholic Charities between 2004 and 2011 who would do her laundry, pick things up for her, cook for her, and bathe her.

¶ 17    On September 12, 2014, the trial court entered its ruling, determining that the decedent's estate should be divided evenly among the four sons.  The trial court explained that the 2005 deed did not validly transfer the property into joint tenancy, because the decedent did not intend to convey any present interest to Michael when she signed it.  The trial court found that the 2006 trust was valid.  The trial court further found that the estate had not presented sufficient evidence that Michael had exerted undue influence before or when the 2011 trust was made and executed.  The trial court therefore determined that the 2011 trust was valid and that it effectively revoked

the 2006 trust. However, because no deed was executed or recorded to transfer the Highland Park home into the 2011 trust, the 2011 trust did not include the Highland Park home. As the 2011 trust revoked the 2006 trust, and the 2006 deed was now funding a revoked trust, the trial court found that the Highland Park home reverted to the decedent's probate estate (which would be divided equally among the four sons according to the laws of intestacy).

¶ 18    The trial court further denied Michael's claim against the estate because he had failed to demonstrate that he had "dedicate[d] himself" to taking care of a disabled person. The trial court explained that there was evidence that he had provided only minimal assistance to the decedent with regard to transportation, providing meals, or helping with household tasks. Additionally, the trial court found that there was no evidence as to how much time he spent with her on a daily or weekly basis; there were no calendars, diaries, or other records documenting any activities with the decedent; and the statements by the decedent to Michael's brothers (which were admitted without objection) indicated that Michael, his girlfriend, and his children did not make it a regular practice to include her in activities of daily living, such as meals. As such, the trial court found that Michael did not "personally care" for the decedent and was not entitled to statutory compensation. Michael thereafter filed a timely notice of appeal.

¶ 19                                ANALYSIS

¶ 20    Michael's first contention on appeal is that the trial court erred in determining that the decedent did not validly transfer the Highland Park home into joint tenancy with him in 2005. In order for a deed to transfer title to property, the deed must be signed, sealed, and delivered. *Nofftz v. Nofftz*, 290 Ill. 36, 41 (1919). Even if a deed is executed, it conveys no title unless it is proven that the deed was delivered. *Id.* The mere placing of a deed in the grantee's hands does not in and of itself constitute a delivery. *Sample v. Geathard*, 281 Ill. 79, 82 (1917). Whether a

deed has been delivered depends upon the intention of the grantor, and the question of that intention is a question of fact depending on the circumstances of each case. *Stanford v. Stanford*, 371 Ill. 211, 215 (1939). For a deed to be valid as an instrument of conveyance, there has to be delivery with the intention of passing title at that time. *Rouland v. Burton*, 296 Ill. App. 138, 142-43 (1938). If the deed is intended to become operative only in the event of the grantor's death, it would be in law a testamentary disposition and would have to conform to the requirements of the Statute of Wills. *Id.*

¶ 21 There is a presumption that a deed has been delivered in a "case of a voluntary settlement by a parent upon a child in which there is a reservation of a life estate in the parent." *Nofftz*, 290 Ill. at 42. This presumption may be rebutted, however, by a showing that it was not the intention of the grantor to deliver the deed. *Sample*, 281 Ill. at 82. Where the grantee obtains possession of and records a deed after the grantor's death, delivery is not presumed and any presumption of delivery has no force when confronted with evidence, even of the slightest character. *Foster v. Foster*, 273 Ill. App. 3d 106, 110 (1995). A trial court's finding that delivery did or did not occur will not be disturbed unless it is against the manifest weight of the evidence. *In re Estate of Wittmond*, 314 Ill. App. 3d 720, 728 (2000).

¶ 22 Here, we cannot say that the trial court's determination that the decedent did not deliver the deed to Michael is against the manifest weight of the evidence. First, we observe that, although there was a presumption, based on the mother-son relationship between the decedent and Michael, that there was a valid delivery of the deed (*Nofftz*, 290 Ill. at 42), that presumption was cancelled out by the failure of Michael and the decedent to record the deed prior to her death (*Foster*, 273 Ill. App. 3d at 110). Second, we note that the decedent made several representations to others that she was the sole owner of the property. She made this

representation to the State of Illinois in order to get a deferment on paying part of her property taxes. She made this representation to Magill in 2006 when she placed the Highland Park home into a trust. Further, she made this representation to a bank when she refinanced the Highland Park home in March 2011. The decedent's representations to others that she was the sole owner of the property indicate that she did not intend the 2005 deed to deliver any present interest in the Highland Park home to Michael.

¶ 23    Moreover, we note that Michael did not exercise dominion over the property. Prior to the decedent's death, he did not indicate to his brothers or anyone other than the attorney who drafted the 2005 deed that he was the owner of the Highland Park home. Although he made some mortgage payments on the property, Michael explained that the decedent viewed those payments as being made in lieu of rent. Payment of rent on the property suggests that he did not really own that property. See *id.* at 110-11. Further, although Michael argues that he made some payments associated with maintaining the home, we note that the evidence suggests that many of these payments were made from checking accounts that were commingled with the decedent's assets. As such, and in conjunction with the trial court's finding that Michael was not a credible witness, there is no basis for us to find that the trial court's determination that the decedent did not intend to deliver the 2005 deed to Michael is against the manifest weight of the evidence.

¶ 24    Michael's second argument on appeal is that the trial court erred in not finding that he was entitled to the Highland Park home based on the decedent's 2011 trust. In order to resolve this contention, we must determine whether the decedent ever intended that the Highland Park home be part of her 2011 trust.

¶ 25    A court's primary concern in construing a trust is to discover the settlor's intent, which the court will effectuate if it is not contrary to law or public policy. *First National Bank of*

*Chicago v. Canton Council of Campfire Girls*, 85 Ill. 2d 507, 513 (1981). The settlor's intent is determined as of the time the instrument is executed. *Id.* In determining the settlor's intent, the court must consider the plain and ordinary meaning of the words used and must consider the entire document. *Id.* at 514. The court may also consider the surrounding circumstances when the instrument was executed, to the extent that they may aid in determining the settlor's intent in using certain language. *Id.* If the intent may be gathered from the language of the document, without reference to the rules of construction, there is no need to use those rules. *Id.*

¶ 26 Here, the decedent set forth in article 3 of the 2011 Trust the gifts she wanted distributed from her trust estate. As subheading 3.5 refers to "Survivorship," it is readily apparent that, despite the heading, not everything listed under article 3 was intended to be a gift from the trust estate. In subheading 3.3, the decedent referred to a gift of the "balance" of the trust estate. A "balance" is the "residue or remainder, and, in a general sense, may be defined as what remains or is left over." Black's Law Dictionary 142 (6th ed. 1990). A "residue" is "[t]he surplus of a testator's estate remaining after all the debts, taxes, costs of administration, and particular legacies have been discharged." *Id.* at 1310. Based on the above meanings of the terms "balance" and "residue," the reasonable inference is that the decedent intended that no gifts from the trust estate were listed after subheading 3.3, as that subheading covered everything that was "remaining." As the reference to the Highland Park home occurs under subheading 3.4 (after subheading 3.3), the logical inference is that the decedent did not intend the Highland Park home to be part of the trust estate.

¶ 27 This determination is bolstered by the plain language of subsection 3.4. Nowhere in that subsection did the decedent indicate that she intended to convey or transfer any interest in the Highland Park home to the trust estate. Rather, by explaining that she had previously quit-

claimed the property to Michael in joint tenancy, the decedent was actually explaining why she was *not* transferring the Highland Park home to the trust. As the plain language of article 3 demonstrates that the decedent did not intend to convey the Highland Park home to the trust, Michael cannot receive an ownership interest in the home on the basis of the trust.

¶ 28 We next turn to Michael's third contention, that the trial court erred in denying his claim under section 18-1.1 of the Probate Act (755 ILCS 5/18-1.1 (West 2012)). That section provides:

> "Any spouse, parent, brother, sister, or child of a disabled person who dedicates himself or herself to the care of the disabled person by living with and personally caring for the disabled person for at least 3 years shall be entitled to a claim against the estate upon the death of the disabled person. The claim shall take into consideration the claimant's lost employment opportunities, lost lifestyle opportunities, and emotional distress experienced as a result of personally caring for the disabled person." *Id.*

In order to recover under section 18-1.1, a claimant must demonstrate that he dedicated himself to the care of the decedent. *Id.* "Dedicate" means to commit to something as a constant goal or way of life. *In re Estate of Jolliff*, 199 Ill. 2d 510, 517 (2002). Although not dispositive, factors to consider as to whether a claimant dedicated himself to the decedent's care include whether the claimant lost employment opportunities, lost lifestyle opportunities, and suffered emotional distress due to his care of the decedent. *In re Estate of Lower*, 365 Ill. App. 3d 469, 478-79 (2006) (citing 755 ILCS 5/18-1.1 (West 2004)). A trial court's finding as to whether a claimant is entitled to compensation pursuant to section 18-1.1 will not be disturbed unless that finding is against the manifest weight of the evidence. *Id.* at 479.

¶ 29    We do not believe that the trial court's finding that Michael did not dedicate himself to the care of the decedent is against the manifest weight of the evidence.  Michael acknowledged that he did not lose any employment opportunities due to his care of the decedent.  He did not testify as to how much time he spent with the decedent on a daily or weekly basis.  As the trial court found, Michael's lifestyle opportunities actually improved after he moved in with the decedent, as he was able to live in a four-bedroom house, pay less than he did when he previously lived in a one-bedroom apartment, and send his children to the Highland Park schools.  There is no indication in the record that Michael suffered any emotional distress due to his care of the decedent.

¶ 30    In so ruling, we reject Michael's argument that the numerous things that he did on the decedent's behalf—cooking for her daily, and regularly assisting her by house cleaning, doing laundry, administering medications, and driving her to medical appointments and other personal errands—warranted his being compensated under the Probate Act.  The trial court specifically found that Michael was not credible, and thus his testimony is not a basis to disturb the trial court's ruling.  See *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 41 (reviewing court will not disturb trial court's credibility determinations).

¶ 31    Further, even if we were to overlook the trial court's credibility determination, we note that Michael's insistence that he did a lot of things for his mother over a six-year period does not necessarily rise to a level of dedication that merits his being compensated.  *Cf. Lower*, 365 Ill. App. 3d at 478-79 (claimant showed dedication to decedent's care by watching decedent, monitoring his needs, sleeping next to him, and awaking several times each night to alert the caretaker of problems decedent was having).

¶ 32    Moreover, we reject Michael's claim that he is entitled to compensation under the Probate Act because he paid numerous bills on the decedent's behalf.  Claims for custodial care under section 18-1.1 are in addition to other monetary claims, not in place of them.  See *In re Estate of Hale*, 383 Ill. App. 3d 559, 564-65 (2008).

¶ 33                                CONCLUSION

¶ 34    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 35    Affirmed.