MARY WHITTAKER, as Successor Trustee of the Clarice Dauberman Trust, Plaintiff-Appellant, v. CAROL LEE STABLES, Indiv. and as Successor Trustee of the Clarice Dauberman Trust, Defendant-Appellee (Scott Whittaker, Intervenor-Appellant).

Second District   No. 2—02—0234

Opinion filed June 9, 2003.

944

Ted A. Meyers, of Foote, Meyers, Mielke & Flowers, L.L.C., of Geneva, and Dana C. Crowley, of Dana Crowley & Associates, of Chicago, for appellants.

Ralph E. Lowe, of Lowe & Steinmetz, Ltd., of Aurora, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

The parties to this case dispute the disposition of the estate of Clarice Dauberman, who died February 16, 1999. At issue is whether a document, handwritten by Dauberman and delivered to her daughter after Dauberman's death, amended the terms of her trust. The trial court found that it did not and granted summary judgment in favor of defendant, Carol Lee Stables. Plaintiff, Mary Whittaker (Mary), and intervenor, Scott Whittaker (Scott), appeal. We reverse and remand.

BACKGROUND

Dauberman changed the distribution of her estate several times during her life. A 1988 will divided her estate equally between her two children, Stables and Andrew Whittaker. Shortly after the death of her son in 1990, Dauberman prepared a new will leaving 75% of her estate to Stables and 25% to her grandson Scott, Andrew Whittaker's son. Dauberman again altered her estate plan on July 21, 1997, when she executed a declaration of trust and a last will and testament. The will distributed items of personal property and left everything else to be distributed in accordance with the terms of the trust. The trust gave Dauberman the benefit of the principal and income during her lifetime. It also provided that after death expenses, $1,000 was to be paid to each of her four grandsons, with the remainder distributed to Stables. Three grandsons were the children of Stables, and the fourth grandson was Scott.

Dauberman was named the original trustee. After her death, her

husband, Earl Dauberman, who was designated first successor trustee, declined to serve. The responsibility then went to Stables and Mary (Dauberman's daughter-in-law), and they were named co-trustees and co-executors. Stables distributed the estate according to the 1997 will and trust.

According to Mary's deposition testimony, Dauberman drafted the 1997 documents under pressure from Stables. Dauberman told Stables earlier in 1997 that both Stables and Scott were to receive part of her estate. Stables became angry and said that the plan put Scott ahead of her sons. Mary further testified that Stables was also not satisfied with a will Dauberman drafted giving Stables and each grandchild 20% of the estate. Stables threatened to never see or speak to Dauberman again, and Stables did not return Dauberman's phone calls for many weeks. Mary believes Dauberman executed the 1997 documents to appease Stables. Barbara Burgholzer, Dauberman's housekeeper/friend, also testified in her deposition that although Dauberman loved her daughter, she was a little bit afraid of her.

In the last year of her life, Dauberman prepared a writing and placed it in a sealed envelope addressed to Stables. She gave it to Burgholzer with specific instructions to deliver it, after her death, to Stables. Stables received the writing as planned. The parties to this case dispute the contents of the note. The document is no longer available because Stables admittedly destroyed it.

Stables claims that the writing contained instructions for her to make sure that the July 21, 1997, will was probated. She further claims she did not share the contents of the writing with anyone. Mary testified in her deposition that either she read or Stables read to her all or part of the writing. Mary referred to it as a letter and testified that it said something to the effect of: "Dear Carol, I love you very much and don't want to upset you, but I want Scott to have his father's share. Love, Mom." Mary thought there may have been something written after that. When Mary was asked during her deposition if she had noticed whether Dauberman signed the letter, she replied:

> "[I]t was signed something like, 'Love, Mom.' I mean, it wasn't signed 'Clarice.' This wasn't my father. My dad used to sign his letters, 'Love, your Father, J.M. Newton.' You know, there aren't many people who sign their letters to their children that way."

Mary testified that Stables discussed a 50-50 split between Stables and Scott in the presence of family members. Scott also testified in his deposition that Stables told him he was to receive half of Dauberman's estate.

According to Mary, Stables discovered Dauberman's 1990 will

while going through her mother's papers a few weeks after the funeral. Mary said that Stables became very upset upon finding the will and said, in her presence, "Why didn't mom let me read this[?] *** If she had of [sic], I wouldn't have even had to make her change anything. *** Mom was leaving me 75%. Scott was only getting 25%. I just screwed myself out of half of what I was going to get." Stables then said she was going to give Scott only 25% of the residuary estate, in accordance with the 1990 will. Stables later distributed to him 25% of a farm payment payable to the trust.

Scott testified in his deposition that he talked with Stables by phone about two months after Dauberman's death. At that time, Stables still discussed splitting the estate equally. However, the next day, Stables called him and said that the deal was off, and he should not call her again.

Mary initially filed a petition to remove Stables as co-trustee and co-executor on the grounds that Stables unilaterally distributed the trust and estate assets to herself, without authority. Scott then intervened and petitioned for declaratory relief, arguing that Dauberman's handwritten document constituted a valid amendment to the trust and that he was entitled to 50% of Dauberman's estate. The parties filed cross-motions for summary judgment, and the trial court granted summary judgment in favor of Stables. On appeal, Mary and Scott argue that the court erred in (1) holding that the note could not be a valid amendment to the trust; (2) denying them summary judgment; and (3) granting summary judgment for Stables.

## ANALYSIS

■ Summary judgment is appropriate when the pleadings, depositions, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2000). We review a grant of summary judgment *de novo*. *General Casualty Insurance Co. v. Lacey*, 199 Ill. 2d 281, 284 (2002). In order to determine whether the trial court's grant of summary judgment was appropriate, we must examine whether the handwritten document could have been a valid amendment to the trust.

■ If a method of exercising a power to modify is described in the trust instrument, the power can be asserted only in that manner. *Parish v. Parish*, 29 Ill. 2d 141, 149 (1963). Article I of Dauberman's declaration of trust provides: "By signed instruments delivered to the Trustee, during my life, I may revoke this agreement in whole or in part from time to time in any respect." The court's main concern in construing a trust is to determine the intent of the creator *when the*

*instrument was executed,* and the court must consider the plain and ordinary meanings of the words used. *Williams v. Springfield Marine Bank,* 131 Ill. App. 3d 417, 419-20 (1985). The court is limited to establishing what the creator did say rather than what the creator meant to say. *Williams,* 131 Ill. App. 3d at 420. Therefore, in order to modify the trust, Dauberman required (1) a signed instrument; (2) delivered to the trustee; (3) during her lifetime. We discuss each of these requirements in turn.

## A. Signed Instrument

■ In this case, Stables destroyed the writing that purportedly modified the trust. When one destroys a written instrument of any kind and the contents of the writing become a matter of judicial inquiry between the spoliator and an innocent party, the innocent party may establish a right founded thereon by slight evidence rather than strict proof of the writing's contents. *Anderson v. Irwin,* 101 Ill. 411, 416 (1882). In such a case, all presumptions shall be taken against the spoliator. *Hudson v. Hudson,* 287 Ill. 286, 301 (1919).

■ Based on Mary's recollection, Dauberman signed the document "Love, Mom." It is well established that the name used is not important as long as the person to whom it applies is identified as being the one having authority to act. *Anderson v. Quinn,* 65 Ill. App. 2d 193, 198 (1965). Dauberman, as creator and trustee of the trust, clearly had authority to amend the trust "in whole or in part from time to time in any respect." Moreover, in presuming that the evidence is against Stables, we will assume that the writing possessed the wording necessary for the status of a signed instrument. Thus, we hold that Dauberman's letter satisfied the "signed instrument" requirement.

## B. Delivered to the Trustee During Her Lifetime

■ Whether the writing was delivered to the trustee during her lifetime is a question independent of the contents of the writing. The parties do not dispute that Dauberman sealed the document in an envelope addressed to Stables and entrusted it to Burgholzer, with specific instructions that it be delivered to Stables after Dauberman's death. It is Stables' position that Dauberman's actions did not effectively amend the trust. Specifically, Stables argues that, because the letter was delivered to Burgholzer rather than a trustee, the delivery requirement was not satisfied. In addition, Stables contends that delivery did not occur during Dauberman's lifetime since the contents of the letter were not intended to take effect until after Dauberman's death. We disagree.

■ When it comes to trust agreements, there is a legal presump-

tion in favor of delivery. *Jackson v. Pillsbury*, 380 Ill. 554, 577 (1942). Furthermore, manual delivery is unnecessary where the trustee has accepted in writing the terms and provisions of the document. *Jackson*, 380 Ill. at 577.

■ We note initially that this case presents a unique situation in that Dauberman both created the trust and served as trustee. However, it is this dual role that controls the outcome here. In terms of "delivery," this requirement was automatically satisfied the moment Dauberman created the letter. With Dauberman acting as trustee, we know of no other action required. Indeed, had Dauberman placed the letter in a drawer, for example, there would be no question as to whether she had effectively amended the trust. Thus, the fact that Dauberman decided to entrust the letter to a third party rather than retain it herself is immaterial.

In line with this reasoning, it is also clear that Dauberman delivered the document, albeit to herself, "during her lifetime." Again, we are left with no other conclusion. Obviously, Dauberman was alive at the time she wrote the letter. As a result, Dauberman's letter effectively amended the trust *at the time* she created it. The fact that Stables was not to learn of this amendment until after Dauberman's death is of no consequence. In light of the record, it is conceivable that Dauberman entrusted the letter to Burgholzer in order to avoid further disharmony with her daughter during her lifetime. Dauberman's instructions for future delivery of the letter to Stables evidenced an intention to amend the trust without Stables' knowledge.

In sum, we hold that the letter created by Dauberman satisfied the three requirements for modifying the trust. Because Dauberman effectively amended the trust, it was error for the court to grant summary judgment in favor of Stables.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court of Kane County granting summary judgment to Stables and remand the cause for further proceedings consistent with this opinion.

Reversed and remanded.

BYRNE and KAPALA, JJ., concur.