2015 IL App (2d) 150084
No. 2-15-0084
Opinion filed September 9, 2015

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE ESTATE OF DIANE MENDELSON, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Petitioner and | ) | |
| Counterrespondent-Appellee, | ) | |
| | ) | |
| v. | ) | No. 11-P-919 |
| | ) | |
| MICHAEL MENDELSON, | ) | |
| | ) | Honorable |
| Respondent and | ) | Michael J. Fusz, |
| Counterpetitioner-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Zenoff and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1   The instant controversy arises primarily from a dispute as to whom the decedent, Diane Mendelson, intended to inherit her Highland Park home.  In 2005, she signed a deed that placed the home in joint tenancy with her son Michael Mendelson.  In 2006, she prepared a trust that divided her estate (including the home) equally among her four sons.  In 2011, three months before she died, she revoked the 2006 trust and created a new trust that awarded the home solely to Michael upon her death.  After the decedent's death, the circuit court of Lake County considered competing claims between Michael and his three brothers as to their interests in the Highland Park home and determined that the four brothers had equal interests in the home.  The

trial court also rejected Michael's claim that he was entitled to compensation for the care that he provided to the decedent prior to her death. For the reasons that follow, we determine that the trial court properly rejected Michael's claim for compensation but erred in not awarding him a 100% interest in the Highland Park home.

¶ 2                               BACKGROUND

¶ 3      The decedent had four sons: Robert, Michael, Ronald, and Daniel Mendelson. She owned and lived at a home located at 1509 Arbor Avenue in Highland Park. In 2004 or 2005, Michael, along with his girlfriend and his two children, moved in with the decedent.

¶ 4      On July 15, 2005, the decedent executed a deed to her home, placing it in joint tenancy with herself and Michael as the joint tenants (the 2005 deed). Neither the decedent nor Michael recorded the deed during the decedent's lifetime. Michael explained that the decedent was a senior citizen who received a property tax benefit, allowing her to defer payment of a substantial portion of those taxes. Both Michael and the decedent were concerned that if she recorded the deed she would lose that property tax benefit.

¶ 5      On June 16, 2006, the decedent signed estate planning documents prepared by attorney Larry Magill. The documents included: (1) a last will and testament; (2) the Diane Mendelson Living Trust, dated June 16, 2006 (the 2006 trust); (3) a Property Power of Attorney; (4) a Health Care Power of Attorney; (5) a Living Will; and (6) a Deed in Trust (the 2006 deed). The 2006 deed transferred the Highland Park home from the decedent to the 2006 trust. The 2006 trust provided that, after her death, her estate was to be divided equally among her four sons. On September 18, 2006, the 2006 deed was recorded with the Lake County Recorder of Deeds. Magill testified that the decedent never told him that she had placed her home in joint tenancy with Michael. Rather, she told him that Michael had been pressuring and threatening her to sign

some documents that she had not read and did not understand. She also told him that she wanted to be even and fair to her four sons and wanted to leave her property to her sons in equal shares.

¶ 6 In March 2011, the decedent refinanced the mortgage on the Highland Park home through Fifth Third Bank. In the refinancing settlement statement, she listed herself as the sole owner of the property.

¶ 7 On July 1, 2011, the decedent executed a new trust (the 2011 trust). The 2011 trust designated the decedent as trustee and Michael as successor trustee. The 2011 trust stated that it revoked any and all prior trusts. The 2011 trust identified the Highland Park home as part of the trust estate and specifically stated that the decedent intended that her home become Michael's sole and exclusive property upon her death.

¶ 8 On October 1, 2011, the decedent died.

¶ 9 On October 5, 2011, Michael recorded the 2005 deed. On November 14, 2011, Michael recorded the 2011 trust along with a deed identical to the 2005 deed.

¶ 10 On November 22, 2011, the decedent's estate filed a petition to determine the proper distribution of the Highland Park home. The petition requested that the court declare the real property to be legally titled in the name of the 2006 trust, or, in the alternative, if the trial court declared the 2006 trust revoked, that the property be subject to probate and distributed according to the laws of intestacy.

¶ 11 On February 12, 2012, Michael filed a custodial care claim against the estate pursuant to section 18.1-1 of the Probate Act of 1975 (755 ILCS 5/18.1-1 (West 2012)). Michael sought $125,000 for the personal care that he provided to the decedent.

¶ 12 On March 19, 2012, Michael filed a counterpetition to determine the disposition of the Highland Park home. He claimed that the 2005 deed and the 2011 trust entitled him to

ownership of that home. The counterpetition further alleged that he had paid the mortgage, real estate taxes, and upkeep and remodeling of the home out of his own funds from March 2004 through the date of the filing of the counterpetition.

¶ 13 From April 21 to May 9, 2014, the trial court conducted a hearing on the parties' competing petitions. As to the Highland Park home, Michael testified that, in lieu of rent, the decedent had him pay the monthly mortgage of $527. This was less than he had been paying for a one-bedroom apartment in Chicago ($599).

¶ 14 Michael testified that he cooked meals for the decedent daily, that he made breakfast for her every morning, and that he assisted her in cleaning the house and doing laundry. The decedent stopped driving during the last three or four years of her life. After that, he took her to physical therapy sessions about 12 times per month. He helped her take medications, took her shopping, helped her with laundry, and ran errands for her.

¶ 15 Daniel testified that he lived about 15 minutes from the decedent and that he visited her about once a week. He believed that, between 2006 and 2011, she was not eating with Michael or his family and no one was preparing her food, because she had asked him (Daniel) to order her Meals on Wheels. On 10 occasions from 2006 to 2011 when he was there at dinner time, he observed that she had already eaten and was in her room. He never saw her eat with the family on those occasions. She had a home caretaker/companion from Catholic Charities between 2004 and 2011 who would do her laundry, pick things up for her, cook for her, and bathe her.

¶ 16 On September 12, 2014, the trial court entered its ruling, determining that the decedent's estate should be divided evenly among the four sons. The trial court explained that the 2005 deed did not validly transfer the property into joint tenancy, because the decedent did not intend to convey any present interest to Michael when she signed it. The trial court found that the 2006

trust was valid. The trial court further found that the estate had not presented sufficient evidence that Michael had exerted undue influence before or when the 2011 trust was made and executed. The trial court therefore determined that the 2011 trust was valid and that it effectively revoked the 2006 trust. However, because no deed was executed or recorded to transfer the Highland Park home into the 2011 trust, the 2011 trust did not include the Highland Park home. As the 2011 trust revoked the 2006 trust, and the 2006 deed was now funding a revoked trust, the trial court found that the Highland Park home reverted to the decedent's probate estate (which would be divided equally among the four sons according to the laws of intestacy).

¶ 17    The trial court further denied Michael's claim against the estate because he had failed to demonstrate that he had "dedicate[d] himself" to taking care of a disabled person. The trial court explained that there was evidence that he had provided only minimal assistance to the decedent with regard to transportation, providing meals, or helping with household tasks. Additionally, the trial court found that there was no evidence as to how much time he spent with her on a daily or weekly basis; there were no calendars, diaries, or other records documenting any activities with the decedent; and the statements by the decedent to Michael's brothers (which were admitted without objection) indicated that Michael, his girlfriend, and his children did not make it a regular practice to include her in activities of daily living, such as meals. As such, the trial court found that Michael did not "personally care" for the decedent and was not entitled to statutory compensation. Michael thereafter filed a timely notice of appeal.

¶ 18                                                    ANALYSIS

¶ 19    Michael's first contention on appeal is that the trial court erred in determining that the decedent did not validly transfer the Highland Park home into joint tenancy with him in 2005. In order for a deed to transfer title to property, the deed must be signed, sealed, and delivered.

*Nofftz v. Nofftz*, 290 Ill. 36, 41 (1919). Even if a deed is executed, it conveys no title unless it is proven that the deed was delivered. *Id.* The mere placing of a deed in the grantee's hands does not in and of itself constitute a delivery. *Sample v. Geathard*, 281 Ill. 79, 82 (1917). Whether a deed has been delivered depends upon the intention of the grantor, and the question of that intention is a question of fact depending on the circumstances of each case. *Stanford v. Stanford*, 371 Ill. 211, 215 (1939). For a deed to be valid as an instrument of conveyance, there has to be delivery with the intention of passing title at that time. *Rouland v. Burton*, 296 Ill. App. 138, 142-43 (1938). If the deed is intended to become operative only in the event of the grantor's death, it would be in law a testamentary disposition and would have to conform to the requirements of the Statute of Wills. *Id.*

¶ 20    There is a presumption that a deed has been delivered in a "case of a voluntary settlement by a parent upon a child in which there is a reservation of a life estate in the parent." *Nofftz*, 290 Ill. at 42. This presumption may be rebutted, however, by a showing that it was not the intention of the grantor to deliver the deed. *Sample*, 281 Ill. at 82. Where the grantee obtains possession of and records a deed after the grantor's death, delivery is not presumed and any presumption of delivery has no force when confronted with evidence, even of the slightest character. *Foster v. Foster*, 273 Ill. App. 3d 106, 110 (1995). A trial court's finding that delivery did or did not occur will not be disturbed unless it is against the manifest weight of the evidence. *In re Estate of Wittmond*, 314 Ill. App. 3d 720, 728 (2000).

¶ 21    Here, we cannot say that the trial court's determination that the decedent did not deliver the deed to Michael is against the manifest weight of the evidence. First, we observe that, although there was a presumption, based on the mother-son relationship between the decedent and Michael, that there was a valid delivery of the deed (*Nofftz*, 290 Ill. at 42), that presumption

was cancelled out by the failure of Michael and the decedent to record the deed prior to her death (*Foster*, 273 Ill. App. 3d at 110). Second, we note that the decedent made several representations to others that she was the sole owner of the property. She made this representation to the State of Illinois in order to get a deferment on paying part of her property taxes. She made this representation to Magill in 2006 when she placed the Highland Park home into a trust. Further, she made this representation to a bank when she refinanced the Highland Park home in March 2011. The decedent's representations to others that she was the sole owner of the property indicate that she did not intend the 2005 deed to deliver any present interest in the Highland Park home to Michael.

¶ 22 Moreover, we note that Michael did not exercise dominion over the property. Prior to the decedent's death, he did not indicate to his brothers or anyone other than the attorney who drafted the 2005 deed that he was the owner of the Highland Park home. Although he made some mortgage payments on the property, Michael explained that the decedent viewed those payments as being made in lieu of rent. Payment of rent on the property suggests that he did not really own that property. See *id.* at 110-11. Further, although Michael argues that he made some payments associated with maintaining the home, we note that the evidence suggests that many of these payments were made from checking accounts that were commingled with the decedent's assets. As such, and in conjunction with the trial court's finding that Michael was not a credible witness, there is no basis for us to find that the trial court's determination that the decedent did not intend to deliver the 2005 deed to Michael is against the manifest weight of the evidence.

¶ 23 Michael's second contention on appeal is that the trial court erred in not finding that he was entitled to the Highland Park home based on the decedent's 2011 trust.

¶ 24    We first consider section 2.1 of the 2006 trust, which explains how that trust may be amended or revoked.  Section 2.1 allows for amendment of the 2006 trust: (1) by an instrument other than a will; (2) signed by the decedent; (3) referring to the 2006 trust; and (4) delivered to her during her life.  Section 2.1 is clear that any amendment, to be effective, must satisfy each of these requirements.  See *Parish v. Parish*, 29 Ill. 2d 141, 149 (1963) (where a method of exercising a power to modify is described in the trust agreement, the power may be asserted only in the manner described).

¶ 25    Here, the 2011 trust was not a will, was signed by the decedent, referred to all prior trusts, and was delivered to her during her lifetime.  See *Whittaker v. Stables*, 339 Ill. App. 3d 943, 948 (2003) (delivery requirement was automatically satisfied the moment decedent drafted and signed the instrument).  Thus, as the 2011 trust complied with the provisions of the 2006 trust regarding revocation, the 2006 trust was effectively revoked.

¶ 26    We next address the validity of the 2011 trust.  The requirements of a valid express trust are: (1) intent of the parties to create a trust, which may be shown by a declaration of trust by the settlor or by circumstances that show that the settlor intended to create a trust; (2) a definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose and how the trust is to be performed; and (6) delivery of the trust property to the trustee.  *In re Estate of Wilkening*, 109 Ill. App. 3d 934, 940-41 (1982).  If any of the necessary elements of a trust is not described with certainty, no trust is created.  *Id.* at 941.

¶ 27    Here, the first factor is met as the decedent titled the document "Living Trust" and indicated that she was establishing a lifetime trust.  The second factor is met as the decedent indicated that she was transferring $10 into the trust estate.  The third factor is achieved as the decedent identified her four children and indicated that she intended to provide for all of them

via the trust. The fourth factor is met as the decedent identified herself as trustee and Michael as her successor trustee. The fifth factor is met as the document details, through 11 articles, how the decedent intended that her assets be managed and distributed upon her death.

¶ 28    As to the sixth factor, the trial court essentially found that this factor was not met as it found that the Highland Park home was not delivered into the trust estate. We note that the trial court did not support its decision on this point with any authority. We also note that the estate does not cite any authority in support of the trial court's decision.

¶ 29    In explaining that the 2011 trust was not funded, the trial court stated that no deed was executed or recorded transferring the Highland Park home into the trust. However, a deed does not need to be recorded in order to be valid. *Schaumburg State Bank v. Bank of Wheaton*, 197 Ill. App. 3d 713, 720 (1990). Recording a deed affects that deed's validity only against *bona fide* purchasers (*id.*), something that is not at issue in this case.

¶ 30    As to whether the deed was properly executed, we next address whether the law requires that assets be formally transferred to the trust or whether the trust documents alone are sufficient to bring property into the trust. Although we find no Illinois authority on point, the case of *Ladd v. Ladd*, 323 S.W.3d 772 (Ky. Ct. App. 2010), is instructive. There, the Kentucky Court of Appeals considered the same issue now before us and determined that a declaration of trust is enough in and of itself to effect a transfer where, as here, the settlor names him or herself as trustee:

> "[N]o authority appears to require that a settlor, who also names himself as trustee of a revocable living trust, must convey his property to the trust by separate instrument. To the contrary, all of the authorities support the conclusion that a declaration by the settlor that he holds the property in trust for another, alone, is sufficient." *Id.* at 778.

¶ 31     Although the court relied, in part, upon Kentucky law, it also noted that the Restatement (Second) of Trusts was in accord.  Indeed, section 17 of the Restatement provides that a trust may be created by various means including by "a declaration by the owner of property that he holds it as trustee for another person."  Restatement (Second) of Trusts § 17(a) (1959).  The comments to that section additionally provide that "[i]f the owner of property declares himself trustee of the property, a trust may be created without a transfer of title to the property."  Restatement (Second) of Trusts § 17 cmt. a (1959).  Further instruction may be found in the comments to section 10 of the Restatement (Third) of Trusts, which clarifies that the legal formalities for transfer generally do not apply in such a case:

> "[T]he law [does not] ordinarily require acknowledgment or recordation, or other formal change in ownership records or documents of title, for the effective creation of the trust.  Even additional statutory formalities, such as those applicable to transfers of land requiring that a document be sealed, attested, acknowledged, or recorded, ordinarily are not essential to effect a valid transfer as between transferor and transferee."  Restatement (Third) of Trusts § 10 cmt. c (2003).

¶ 32     The *Ladd* court noted that another treatise on trusts explained that no formal transfer is required because the settlor already owns the property and merely takes a lesser interest in it by creating the trust.  Specifically, that treatise stated:

> "Obviously, if [a] trust is to be created by declaration there is no real transfer of any property interest to a trustee.  The settlor holds a property interest before the trust declaration, and after the declaration he holds a bare legal interest in the same property interest with the equitable or beneficial interest in the beneficiary.  No new property interest has passed to the trustee.  The settlor has merely remained the owner of part of

what he formerly owned." George Gleason Bogert and George Taylor Bogert, The Law of Trusts and Trustees § 141, at 3 (rev. 2d ed. 1979).

¶ 33 As the *Ladd* court noted, all the courts that have addressed the issue to date have determined that a settlor who also names himself as trustee of a revocable living trust does not have to convey his property to the trust by separate instrument. See, *e.g.*, *Rose v. Waldrip*, 730 S.E.2d 529, 534-35 (Ga. Ct. App. 2012); *In re Estate of Heggstad*, 20 Cal. Rptr. 2d 433, 435-37 (Cal. Ct. App. 1993); see also *Bourgeois v. Hurley*, 392 N.E.2d 1061, 1065 (Mass. App. Ct. 1979) (stating that it is "well settled that one may create a trust in securities standing in one's name by a simple declaration to that effect, without the necessity of any further act of transfer or delivery").

¶ 34 Although no Illinois court has yet adopted section 17(a) of the Restatement (Second) of Trusts, we note that the Illinois Supreme Court has consistently cited various sections of the Restatement (Second) of Trusts with approval. See *In re Estate of Feinberg*, 235 Ill. 2d 256, 279 (2009). Further, in accordance with section 17(a), this court has previously held that delivery occurs when the settlor says that it occurs. *Whittaker*, 339 Ill. App. 3d at 943. In *Whittaker*, at issue was whether a letter modifying the trust was delivered to the trustee during her lifetime. The person who created the trust also served as trustee of that trust. We held that the person's dual role controlled the outcome of the case because the "delivery" requirement was automatically satisfied when the person created the letter. There was nothing else for her to do. *Id.* at 948.

¶ 35 Based on the foregoing, we conclude that a settlor who declares a trust naming herself as trustee is not required to separately and formally transfer the designated property into the trust. As such, the decedent's declaration in this case—that her Highland Park home was part of the

2011 trust (of which she was the trustee)—actually made the Highland Park home part of that trust. The trial court should therefore have found that the 2011 trust included the Highland Park home and that the decedent intended to convey a 100% interest in that home to Michael upon her death.

¶ 36     We next turn to Michael's third contention, that the trial court erred in denying his claim under section 18-1.1 of the Probate Act (755 ILCS 5/18-1.1 (West 2012)).   That section provides:

> "Any spouse, parent, brother, sister, or child of a disabled person who dedicates himself or herself to the care of the disabled person by living with and personally caring for the disabled person for at least 3 years shall be entitled to a claim against the estate upon the death of the disabled person.  The claim shall take into consideration the claimant's lost employment opportunities, lost lifestyle opportunities, and emotional distress experienced as a result of personally caring for the disabled person." *Id.*

In order to recover under section 18-1.1, a claimant must demonstrate that he dedicated himself to the care of the decedent. *Id.*  "Dedicate" means to commit to something as a constant goal or way of life. *In re Estate of Jolliff*, 199 Ill. 2d 510, 517 (2002).  Although not dispositive, factors to consider as to whether a claimant dedicated himself to the decedent's care include whether the claimant lost employment opportunities, lost lifestyle opportunities, and suffered emotional distress due to his care of the decedent. *In re Estate of Lower*, 365 Ill. App. 3d 469, 478-79 (2006) (citing 755 ILCS 5/18-1.1 (West 2004)).  A trial court's finding as to whether a claimant is entitled to compensation pursuant to section 18-1.1 will not be disturbed unless that finding is against the manifest weight of the evidence. *Id.* at 479.

¶ 37    We do not believe that the trial court's finding that Michael did not dedicate himself to the care of the decedent is against the manifest weight of the evidence. Michael acknowledged that he did not lose any employment opportunities due to his care of the decedent. He did not testify as to how much time he spent with the decedent on a daily or weekly basis. As the trial court found, Michael's lifestyle opportunities actually improved after he moved in with the decedent, as he was able to live in a four-bedroom house, pay less than he did when he previously lived in a one-bedroom apartment, and send his children to the Highland Park schools. There is no indication in the record that Michael suffered any emotional distress due to his care of the decedent.

¶ 38    In so ruling, we reject Michael's argument that the numerous things that he did on the decedent's behalf—cooking for her daily, and regularly assisting her by house cleaning, doing laundry, administering medications, and driving her to medical appointments and other personal errands—warranted his being compensated under the Probate Act. The trial court specifically found that Michael was not credible, and thus his testimony is not a basis to disturb the trial court's ruling. See *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 41 (reviewing court will not disturb trial court's credibility determinations).

¶ 39    Further, even if we were to overlook the trial court's credibility determination, we note that Michael's insistence that he did a lot of things for his mother over a six-year period does not necessarily rise to a level of dedication that merits his being compensated. *Cf. Lower*, 365 Ill. App. 3d at 478-79 (claimant showed dedication to decedent's care by watching decedent, monitoring his needs, sleeping next to him, and awaking several times each night to alert caretaker of problems decedent was having).

¶ 40    Moreover, we reject Michael's claim that he is entitled to compensation under the Probate Act because he paid numerous bills on the decedent's behalf.  Claims for custodial care under section 18-1.1 are in addition to other monetary claims, not in place of them.  See *In re Estate of Hale*, 383 Ill. App. 3d 559, 564-65 (2008).

¶ 41                                          CONCLUSION

¶ 42    For the reasons stated, we reverse the trial court's determination that the Highland Park home was not part of the 2011 trust.  Based on the plain language of the 2011 trust, the Highland Park home is awarded to Michael as his sole and exclusive property.  We affirm the trial court's determination that Michael is not entitled to compensation pursuant to section 18-1.1 of the Probate Act.

¶ 43    Affirmed in part and reversed in part.